[Cite as *In re Complaint of Cameron Creek Apts. v. Columbia Gas of Ohio, Inc.,* 136 Ohio St.3d 333, 2013-Ohio-3705.]

IN RE COMPLAINT OF CAMERON CREEK APARTMENTS, INTERVENING APPELLEE, *v.* COLUMBIA GAS OF OHIO, INC., APPELLANT; PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE.

[Cite as *In re Complaint of Cameron Creek Apts. v. Columbia Gas of Ohio, Inc.,* 136 Ohio St.3d 333, 2013-Ohio-3705.]

*Public utilities—Apartment complex sought to prevent utility from terminating service unless owners retrofitted each apartment to conform to model code adopted by utility's tariff—No evidence of imminent or verifiable safety threat was presented—Orders preventing utility from terminating service affirmed.*

(No. 2011-1758—Submitted April 10, 2013—Decided August 29, 2013.)

APPEAL from the Public Utilities Commission of Ohio, No. 08-1091-GA-CSS.

_____

O'NEILL, J.

## SUMMARY

{¶ 1} Appellant, Columbia Gas of Ohio, Inc., is a public utility under R.C. 4905.02. Columbia provides natural gas to intervening appellee, Cameron Creek Apartments, a complex located in Galloway, Ohio.

{¶ 2} Cameron Creek filed a complaint with the Public Utilities Commission of Ohio pursuant to R.C. 4905.26, alleging that Columbia had demanded major structural retrofitting of the ventilation system for the gas appliances in each apartment in the complex. According to Cameron Creek, Columbia unilaterally declared the method of ventilation unsafe because Cameron Creek had failed to comply with the National Fuel Gas Code ("NFG Code") and threatened to disconnect gas service to the entire complex unless Cameron Creek retrofitted the units to meet NFG Code requirements. The complaint requested

that the commission prohibit Columbia from terminating service and requiring expensive remedial construction.

{¶ 3} The commission found in favor of Cameron Creek, and Columbia appealed to this court. Columbia raises six propositions of law. None has merit. Therefore, we affirm the commission's orders.

## FACTS AND PROCEDURAL BACKGROUND

{¶ 4} Cameron Creek consists of 240 apartment units. There are 21 two-story buildings in the complex. The apartments are flats, with each second-floor apartment located directly above a first-floor apartment. Each apartment has a gas furnace and gas water heater. Each apartment also contains a hard-wired combination smoke-detector and carbon-monoxide alarm located in the main living area.

{¶ 5} At issue in this case is the manner in which the gas appliances are vented. The one-bedroom and two-bedroom apartments each have a gas furnace and gas water heater located in a bathroom closet. The walls of the closet have two air grilles that open up into the apartment's main living room. The furnace has a four-inch vent connector, and the water heater has a three-inch vent connector. Both of these connectors are tied together into either a five-inch or six-inch vent. In turn, the vent that runs from the first-floor appliances is tied together with the vent from the second-floor appliances and vented through the roof using a single stack. The three-bedroom apartment is similar, but its gas appliances are located in a hallway closet instead of the bathroom.

{¶ 6} The city of Columbus approved a building permit for Cameron Creek in 1997 and a final occupancy permit in 1998. When Cameron Creek installed the gas appliances, the installations and venting configuration complied with the city's existing building code.

**{¶ 7}** Since 1990, Columbia has continuously used the NFG Code[1] as a reference standard for evaluating the safety of residential gas lines and appliance installations and venting. The NFG Code is a model code written by a private organization that sets out recommended general standards for installations and operations of gas piping and appliances. Columbia considers violations of the NFG Code to be a significant safety hazard and a threat to human life.

**{¶ 8}** In 2006, Columbia began "red tagging" gas appliances at Cameron Creek, citing violations of the NFG Code. Under Columbia's red-tag policy, service technicians are required to turn off the gas supply and attach a red tag to a gas appliance if the appliance is deemed unsafe. Columbia would not reestablish gas service until the customer had arranged for a qualified repairman to make any necessary repairs.

**{¶ 9}** On January 14 and February 18, 2008, Columbia sent letters to Cameron Creek stating that the ventilation of the gas furnaces and water heaters did not comply with the NFG Code and that remedial measures needed to be taken to ensure tenant safety. Columbia presented testimony that the NFG Code requires that Cameron Creek obtain all air involved in combustion, ventilation, and dilution in the gas furnaces and water heaters directly from outdoors and that self-closing doors with weather-stripping be installed on the closets where the appliances are located. Columbia was concerned that failure to fix the violations could cause a buildup of carbon monoxide in the living spaces of the apartments, which in turn could cause serious illness or death to occupants.

**{¶ 10}** After the letters were sent, the parties engaged in discussions in an attempt to resolve the situation. The parties, however, were unable to reach a resolution.

---

1. Unless otherwise noted, all references are to the National Fire Protection Association's National Fuel Gas Code, 1996 Edition, the version in effect at the time Cameron Creek was built.

**{¶ 11}** On August 13, 2008, Columbia informed Cameron Creek that it would disconnect gas service to the entire complex if Cameron Creek did not bring all apartment units into compliance with the NFG Code by October 13, 2008. Cameron Creek responded that the units complied with all applicable building codes at the time of construction and that carbon-monoxide detectors had been installed. Cameron Creek threatened legal action if Columbia refused to provide service.

**{¶ 12}** On September 15, 2008, Columbia sent letters directly to residents of Cameron Creek, informing them that Columbia would have to disconnect their gas service due to Cameron Creek's refusal to remedy the NFG Code violations. The letter informed residents of the potential risk of carbon-monoxide exposure and that service would be terminated at the end of October 2008 if the problem was not solved.

**{¶ 13}** On September 17, 2008, Cameron Creek filed a complaint against Columbia with the commission pursuant to R.C. 4905.26. The complaint alleged that Columbia had unreasonably and unlawfully threatened to disconnect gas service to all units if Cameron Creek refused to retrofit the ventilation system in each apartment. Cameron Creek estimated that it would cost a minimum of $1,500 per apartment to comply with Columbia's demands.

**{¶ 14}** On October 8, 2008, the attorney examiner assigned to the case issued an entry precluding Columbia from terminating service to Cameron Creek, unless disconnection of an individual unit was necessary to prevent or resolve a present or imminent hazardous situation. By entry issued April 24, 2009, the attorney examiner granted Columbia's motion to modify the October 8 entry, clarifying that the commission's directive also precluded Columbia from refusing to reconnect gas service unless the refusal was necessary to prevent or resolve a present or imminent hazardous situation.

**{¶ 15}** In July 2009, a three-day hearing was held at the commission. On June 22, 2011, the commission issued its opinion and order. The commission first considered whether Cameron Creek had sustained its burden under R.C. 4905.26 of proving that Columbia's policy of enforcing the NFG Code as stated in its tariff is unjust and unreasonable. The commission found that Columbia did not violate its tariff by applying the NFG Code and that Columbia could continue its practice of relying on and enforcing the most recent NFG Code to determine whether supplying gas service to customers is safe. According to the commission, "Columbia must apply a standard of review that is in keeping with the most current safety standards enforced by the gas industry," and both parties "agree that the NFG Code is an acknowledged compilation of [such safety] standards." Pub. Util. Comm. No. 08-1091-GA-CSS, at 18 (June 22, 2011), available at http://dis.puc.state.oh.us/TiffToPDF/A1001001A11F22B41223H86128.pdf.

**{¶ 16}** The commission then turned to whether Columbia's attempt to require Cameron Creek to retrofit the apartments to conform to current NFG Code standards was unjust and unreasonable. The commission first stated that when there is a verifiable safety hazard, Columbia has the right under its tariff and the commission's rules to disconnect gas service and to require customers to address the safety issue. The commission, however, found that no verifiable safety hazard existed at Cameron Creek. The commission found that the city of Columbus had deemed Cameron Creek safe when it issued building and occupancy permits under the building code in effect at the time of construction and that the complex was still in compliance with all applicable building codes. Thus, as to the question of retrofitting, the commission found that Columbia could not threaten to disconnect service and force Cameron Creek to conform to current NFG Code requirements based merely on a potential safety hazard.

**{¶ 17}** Finally, the commission considered whether Cameron Creek met the NFG Code's alternative compliance methods. According to the commission,

5

Cameron Creek effectively complied with the NFG Code's safety standards when it modified its building plans during construction to add a four-inch fresh-air-supply duct.

{¶ 18} On July 22, 2011, Columbia sought rehearing, raising six grounds. On August 17, 2011, the commission denied rehearing. This appeal followed.

### STANDARD OF REVIEW

{¶ 19} "R.C. 4903.13 provides that a [Public Utilities Commission] order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not reverse or modify a commission decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *Id*.

{¶ 20} Although the court has "complete and independent power of review as to all questions of law" in appeals from the commission, *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997), we may rely on the expertise of a state agency in interpreting a law when "highly specialized issues" are involved and "agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

## DISCUSSION

{¶ 21} The question on appeal is whether Columbia can shut off gas service to the entire apartment complex in order to compel Cameron Creek's owners to retrofit each apartment to conform to current NFG Code standards. The commission's orders found that Columbia was prohibited from taking that action. Columbia now challenges the orders on six grounds. After review, we find that none of Columbia's arguments justifies reversal of the commission's orders.

### I. The court lacks jurisdiction over Columbia's first proposition of law

{¶ 22} In proposition of law No. I, Columbia challenges the commission's conclusion that "a violation of the National Fuel Gas Code's safety requirements is not a hazardous condition." According to Columbia, the commission's orders are unlawful and unreasonable because they are unsupported by the evidence.

{¶ 23} Columbia filed an application for rehearing before the commission pursuant to R.C. 4903.10, setting forth six grounds for rehearing. In none of those grounds, however, did Columbia assert the same claim that it now raises in the first proposition of law. R.C. 4903.10 provides that an application for rehearing "shall be in writing and shall set forth specifically the ground or grounds on which the applicant considers the order to be unreasonable or unlawful. No party shall in any court urge or rely on any ground for reversal, vacation, or modification not so set forth in the application." We have long held that setting forth specific grounds for rehearing is a jurisdictional prerequisite for our review. *See Consumers' Counsel v. Pub. Util. Comm.*, 70 Ohio St.3d 244, 247, 638 N.E.2d 550 (1994); *Akron v. Pub. Util. Comm.*, 55 Ohio St.2d 155, 161-162, 378 N.E.2d 480 (1978); *Cincinnati v. Pub. Util. Comm.*, 151 Ohio St. 353, 86 N.E.2d 10 (1949), paragraph seventeen of the syllabus.

{¶ 24} We have "strictly construed the specificity test set forth in R.C. 4903.10." *Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 59; *see also Consumers' Counsel v. Pub. Util.*

*Comm.* at 248 (recognizing a "strict specificity test" in R.C. 4903.10). Indeed, this court has explained that by using the language set forth in R.C. 4903.10, "the General Assembly indicated clearly its intention to deny the right to raise a question on appeal where the appellant's application for rehearing used a shotgun instead of a rifle to hit that question." *Cincinnati v. Pub. Util. Comm.* at 378. Columbia's rehearing application did not "set forth specifically" the claim asserted in proposition of law No. I: that the commission's "conclusion that a violation of the [NFG] Code's safety requirements is not a hazardous condition is unsupported by the evidence." *Compare id.* at 377 (general grounds raised in the rehearing application could not support the specific ground later relied on by the appellant and therefore the court could not consider the issue); *Agin v. Pub. Util. Comm.*, 12 Ohio St.2d 97, 98, 232 N.E.2d 828 (1967) (a "casual similarity" between the grounds stated in the rehearing application and the statements in the appellants' brief does not meet the requirements of R.C. 4903.10). So regardless of what appears in Columbia's brief on appeal, the failure to set forth specifically those arguments on rehearing as required by R.C. 4903.10 deprives this court of jurisdiction over Columbia's first proposition of law.[2] Accordingly, we dismiss the first proposition of law for lack of jurisdiction.

---

2. We also note that Columbia forfeited any claim that the two carbon-monoxide incidents constituted evidence of a hazardous condition. Columbia disputes the commission's finding that the two carbon-monoxide readings taken by Columbia's service technician were invalid. Columbia first raised this issue in a footnote in its application for rehearing. Columbia's footnote, however, challenged only one of the two readings that were taken. Moreover, Columbia cited no evidence that would support its argument that that reading was valid. By failing to cite supportive evidence in its application for rehearing, Columbia deprived the commission of an opportunity to cure any error when it reasonably could have. *See Parma v. Pub. Util. Comm.*, 86 Ohio St.3d 144, 148, 712 N.E.2d 724 (1999) ("we do not accept * * * objections" when appellant has "deprived the commission of an opportunity to redress any injury or prejudice that may have occurred"); *In re Application of Am. Transm. Sys., Inc.*, 125 Ohio St.3d 333, 2010-Ohio-1841, 928 N.E.2d 427, ¶ 31 (same).

**II. Columbia has not demonstrated that the commission committed reversible error when it ruled that Cameron Creek's venting modification was a permissible alternative to the NFG Code**

{¶ 25} In the second and third propositions of law, Columbia raises several challenges to the commission's finding that Cameron Creek had complied with certain alternative compliance methods of the NFG Code. The following facts are necessary to put this issue in context.

{¶ 26} When Cameron Creek was under construction in 1996, the 1995 Ohio Basic Building and the Ohio Mechanical Codes were in effect, and Columbus enforced those codes for structures within the city. At the time of construction, Cameron Creek modified its original building plans to add a four-inch fresh-air-supply duct that was designed to bring outdoor air into each apartment's mechanical room. Thereafter, the city issued a building permit to Cameron Creek in 1997 and an occupancy permit in 1998, after finding that the installation and venting of the gas water heaters and furnaces complied with all applicable codes.

{¶ 27} Conversely, Columbia applied the NFG Code, through its tariff, when gas service was originally supplied to Cameron Creek. Columbia, however, did not inspect the gas appliances at the complex to determine whether they were in compliance with the NFG Code because the commission's rules did not require the company to inspect appliance installations at that time.

{¶ 28} In the opinion and order, the commission first held that Columbia could not require Cameron Creek to retrofit its apartments because there were no imminent safety threats or verifiable safety issues associated with the gas appliances or venting system at the complex. The commission's order placed significant weight on the fact that the dwellings at Cameron Creek met the standards for construction under the city codes in effect at the time the complex was built. According to the commission, Cameron Creek was still safe because it

had not undergone any renovations since the time of construction and the complex has remained in compliance with all state and local building-code requirements.

{¶ 29} Despite the fact that the city of Columbus has never adopted the NFG Code as part of its building-code standards and applied different safety standards when it issued building and occupancy permits to Cameron Creek, the commission held that Cameron Creek met the "current" NFG Code's allowance for alternative compliance methods because of the addition of the four-inch fresh-air-supply duct at the time of construction. The commission stated that the NFG Code allows for "alternative and specially engineered solutions" as other methods of meeting the safety standards set forth in the code. *See* Sections 1.2 and 5.3.4 of the NFG Code (permitting other methods and special engineering to provide an adequate supply of air for combustion, ventilation, and dilution of gases). The commission noted that when Cameron Creek modified its original building plans to add the four-inch fresh-air-supply duct, it submitted engineering calculations from a licensed professional engineer verifying that combustion air was adequate for the gas appliances. According to the commission, the modified building plan qualified as an alternative-compliance method that was approved by the city, and it effectively brought Cameron Creek into compliance with the current NFG Code.

{¶ 30} Columbia raises several challenges to the commission's finding that Cameron Creek had met the alternative compliance provisions of the NFG Code. Columbia, however, bears the burden of demonstrating reversible error. *AK Steel Corp. v. Pub. Util. Comm.*, 95 Ohio St.3d 81, 88, 765 N.E.2d 862 (2002) (the appellant bears the "burden of demonstrating * * * that it has been or will be prejudiced by the error"). *See also Ohio Commt. of Cent. Station Elec. Protection Assn. v. Pub. Util. Comm.*, 50 Ohio St.2d 169, 174, 364 N.E.2d 3 (1977); *Myers v. Pub. Util. Comm.*, 64 Ohio St.3d 299, 302, 595 N.E.2d 873 (1992). To the degree

that Columbia identifies any error in the order, it has not shown that the error caused harm to Columbia.

{¶ 31} The critical problem is that Columbia does not challenge the commission's finding that Cameron Creek's venting installations were deemed safe because they complied with the local building codes enforced by the city of Columbus. As noted, the city approved Cameron Creek's design at the time of construction and issued building and occupancy permits under the Ohio Building Code and the Ohio Mechanical Code. Cameron Creek's experts testified that those codes allowed for the type of ventilation installed at Cameron Creek and that the gas appliances received a sufficient supply of air for combustion, ventilation, and dilution of gases. Testimony was also presented that Cameron Creek had not undergone any renovations since it was constructed and was currently in compliance with state and local building codes. Based on this evidence, the commission found that Columbia could not force retrofitting of the apartments to comply with the NFG Code, because there was no evidence of any imminent or verifiable safety threat and Cameron Creek was providing a "reasonable margin of safety" for its residents. Pub. Util. Comm. No. 08-1091-GA-CSS, at 21.

{¶ 32} A showing of prejudice would require Columbia to negate the commission's findings that the venting installations are safe under the applicable building codes and that there is no existing safety threat at Cameron Creek. Yet Columbia does not challenge any of the evidence supporting the commission's findings. It does not challenge the qualification of any expert witness. Columbia does not point to any contrary testimony or cross-examination that would call direct testimony into question. Moreover, Columbia does not dispute that the city's building codes permitted the type of ventilation installed by Cameron Creek at the time of construction. And it does not contend that the NFG Code supersedes the city's building codes.

**{¶ 33}** In the end, Columbia has not demonstrated prejudice, which it must in order to obtain a reversal of a commission order. *Indus. Energy Consumers v. Pub. Util. Comm.*, 63 Ohio St.3d 551, 553, 589 N.E.2d 1289 (1992). Even if the commission erred in finding that Cameron Creek's installations met the NFG Code's alternative-compliance methods, Columbia failed to show harm stemming from that error. *See, e.g., Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 67 (rejecting a claim that not only was speculative, but was "supported by no argument or evidence" as to how the alleged error prejudiced the appellant"). Therefore, we reject Columbia's second and third propositions of law.

### III. Columbia's claims regarding carbon-monoxide monitors and "nontight" building construction lack merit

**{¶ 34}** In proposition of law No. IV, Columbia argues that the commission erred when it found that carbon-monoxide detectors provided a reasonable margin of safety at Cameron Creek. According to Columbia, the installation of detectors did not mitigate the carbon-monoxide hazard at the complex. Columbia also challenges the commission's conclusion that the buildings at Cameron Creek provided significant outside-air infiltration because they were not "tightly" constructed.

### A. Columbia's challenges to the carbon-monoxide monitors are frivolous and speculative

**{¶ 35}** Columbia first maintains that the commission concluded that carbon-monoxide detectors require "diligent maintenance and repair" if Cameron Creek is to be safe. Pub. Util. Comm. No. 08-1091-GA-CSS, at 21. But, according to Columbia, the carbon-monoxide detectors do not adequately protect residents because Cameron Creek introduced no evidence that it had maintained its detectors since they were installed in 2008.

**{¶ 36}** Columbia's argument borders on the frivolous. The passage from the commission's order quoted by Columbia is incomplete. The quotation should read: "The Commission agrees that the key to sustaining a safe and hazard-free complex at Cameron Creek is *continued* and diligent maintenance and repair of the gas appliances, ventilation system, and CO detectors, as well as the replacement of appliances when necessary." (Emphasis added.) Pub. Util. Comm. No. 08-1091-GA-CSS, at 21. When the entire passage is construed in context, it is clear that the commission in this case did not require Cameron Creek to submit evidence that it was properly maintaining carbon-monoxide detectors. Instead, the commission merely reminded Cameron Creek of its ongoing obligation to monitor and maintain carbon-monoxide detectors, gas appliances, and ventilation systems.

**{¶ 37}** Columbia also asserts that a carbon-monoxide detector is useless in a power outage if the battery is dead.[3] While this is true, it does not advance Columbia's claim. Cameron Creek's residents might not diligently replace all backup batteries when necessary, but that failure does not render carbon-monoxide detectors inherently unreliable. The fact remains that carbon-monoxide detectors are effective warning devices as long as they have a power source.

**{¶ 38}** Columbia's focus on carbon-monoxide detectors misconstrues the commission's order. The order did not turn solely on the installation and proper functioning of carbon-monoxide detectors at Cameron Creek. Rather, the commission cited other factors when it determined that the key to sustaining a safe complex was continued and diligent maintenance and repair of the gas appliances, ventilation system, and carbon-monoxide detectors.

---

3. We note that hardwired carbon-monoxide detectors generally come equipped with a warning signal to alert residents when the backup battery needs replacing. And most (if not all) detectors have a testing button to determine whether the device is operational.

**B. Columbia's challenge to the type of construction at Cameron Creek is not supported by admissible, material evidence**

{¶ 39} The commission found that Cameron Creek's venting system and construction design allowed for a sufficient combination of indoor and outdoor air to the gas appliances. According to the commission, the gas appliances received a sufficient supply of outside air for combustion and dilution purposes because buildings like those at Cameron Creek that were constructed in the 1990s were not as tightly constructed as buildings are today.

{¶ 40} Columbia challenges this finding, arguing that the construction practices of the 1990s will not keep Cameron Creek's residents safe. Columbia cites five newspaper articles published in the *Columbus Dispatch* in 1996 about carbon-monoxide poisoning in homes. Columbia also refers the court to three cases involving carbon-monoxide-related deaths of or injuries to apartment tenants in the 1990s. Columbia contends that the fact that these articles and opinions were published is proof that the construction is insufficient to protect Cameron Creek's residents from carbon-monoxide poisoning. We disagree.

{¶ 41} First, nothing suggests that Columbia submitted this evidence to the commission or made it part of the record. *See Thomas v. Pub. Util. Comm.*, 24 Ohio St.3d 167, 169, 493 N.E.2d 1328 (1986) (the court considers only the law and facts upon the record made before the commission). Second, Columbia has not submitted copies of the newspaper articles or included anything more than a parenthetical explaining the court opinions; whether they support Columbia's argument is thus unclear. Based on Columbia's failure to explain its appellate arguments and support them with relevant citations to the record, we reject this claim. *Allnet Communications Serv., Inc. v. Pub. Util. Comm.*, 70 Ohio St.3d 202, 206, 638 N.E.2d 516 (1994) (rejecting an argument when the appellant "provided no further reasoning or record citations to support" it).

### C.  The court lacks jurisdiction over the remaining
### claims in proposition of law No. IV

{¶ 42} Columbia makes two additional arguments under its fourth proposition of law: (1) the commission erred in leaving the safety of residents in the hands of Cameron Creek's maintenance staff and (2) the commission has no authority to supervise Cameron Creek's future maintenance activities.  We lack jurisdiction to consider these claims because Columbia failed to set forth either alleged error in its notice of appeal.  *See* R.C. 4903.13 (the procedure for seeking reversal of a commission order is through a notice of appeal "setting forth the order appealed from and the errors complained of"); *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, ¶ 21 (failure to raise error in the notice of appeal precludes this court from considering the issue).

### IV.  Columbia's fifth proposition of law is not well taken;
### the commission's orders provide clear guidance

{¶ 43} In proposition of law No. V, Columbia asserts that the commission's order and rehearing entry are unreasonable because they provide Columbia with no clear guidance as to how it may apply the NFG Code in other existing residential structures.  Columbia's assertion is without merit.

{¶ 44} The commission first held that "when there is a verifiable safety hazard, Columbia has the right, under its tariff and the Commission's rules, to disconnect gas service and require customers to address the safety issue."  Pub. Util. Comm. No. 08-1091-GA-CSS, at 20.  The commission also held that Columbia's current practice of citing and enforcing the NFG Code is just and reasonable and that Columbia can continue to apply the NFG Code as the standard to determine whether supplying gas service to a customer is safe.

{¶ 45} Columbia's argument fails to comprehend the commission's finding that strict adherence to the NFG Code is not required and that other

methods may be employed to ensure that dwellings achieve the "same level of safety espoused by the NFG Code." *Id.* at 21. The commission found that compliance with the NFG Code is a safe harbor for customers, but that compliance cannot be compelled if it is "economically or practically unreasonable." *Id.* Moreover, the order is clear that Columbia may not force extensive retrofitting of dwellings based solely on a violation of the NFG Code. Columbia can require retrofits that are necessary to ensure a reasonable margin of safety, but only if the customer cannot show compliance with the NFG Code *or* a specifically engineered solution that complies with the local building code and is supported by a professional engineering verification of adequacy.

## V. Columbia's undue-burden claim is speculative
## and lacks evidentiary support

{¶ 46} Under the sixth and final proposition of law, Columbia maintains that the vague and subjective standards in the commission's order will impose an enormous administrative burden on Columbia. According to Columbia, its service technicians disconnect hundreds of gas appliances each month for NFG Code violations and the commission's orders will impose significant record-keeping requirements on Columbia and will require extensive and expensive changes to its computer system. We find that this claim lacks merit.

{¶ 47} First, Columbia's claim hinges entirely on the belief that the commission's rulings will create "a backlog of customers contesting the enforceability of the NFG Code." But Columbia's backlog claim is speculative. Even before the commission issued its orders in this case, customers had the right to challenge disconnection of service, and the commission had the ability to determine whether disconnection was reasonable. *See* R.C. 4905.26 (the commission has exclusive jurisdiction to determine whether any public utility service is unjust, unreasonable, or unlawful) and 4905.06 (the commission has "the power to prescribe any rule or order that the commission finds necessary for

16

the protection of the public safety"). Nothing about the commission's orders suggests that customers will now be more inclined to challenge Columbia's disconnections.

**{¶ 48}** Second, an essential premise of Columbia's argument is factual: the commission's orders will impose significant record-keeping requirements and require changes to Columbia's computer system. But Columbia provides almost no citations to the record in support of its factual assertions, and not one citation that is helpful. Columbia provides only a single citation to the record that is relevant to its claims. According to Columbia, the testimony of one of its service technicians demonstrates that its computer system is currently incapable of documenting past service calls addressing NFG Code violations or providing information instantaneously to its service technicians. But this testimony does not support Columbia's argument that it will be necessary to modify its computer system. On the contrary, the technician's testimony indicates that Columbia's service trucks are equipped with onboard computers that allow technicians to record detailed information about service calls and pass that information to other technicians if follow-up service is necessary.

**{¶ 49}** In the end, Columbia fails to identify the kind of evidence that could have supported its claim. Columbia's failure to support its appellate arguments with relevant citations to the record is a fatal flaw. *Allnet Communications Serv., Inc.,* 70 Ohio St.3d at 206, 638 N.E.2d 516 (rejecting an argument when the appellant "provided no further reasoning or record citations to support" it).

## CONCLUSION

**{¶ 50}** We find that none of Columbia's propositions of law is well taken. Therefore, we affirm the commission's orders in this case.

Orders affirmed.

PFEIFER, O'DONNELL, and KENNEDY, JJ., concur.

O'CONNOR, C.J., and LANZINGER and FRENCH, JJ., concur in part and dissent in part.

_____

**FRENCH, J., concurring in part and dissenting in part.**

{¶ 51} I agree that Columbia Gas of Ohio, Inc., may not force Cameron Creek Apartments to retrofit its apartments to conform to the standards in the National Fuel Gas Code ("NFG Code"). I do not agree, however, that the Public Utilities Commission's order gives clear guidance as to what Columbia should do in the future when it identifies a safety hazard. The order does not address whether Columbia can continue its current practice of "red-tagging" and terminating service to unsafe appliances. I would remand to the commission for clarification of that issue.

{¶ 52} Under the commission's order, Columbia may continue to use the NFG Code as its safety standard. Pub. Util. Comm. No. 08-1091-GA-CSS, at 21 (June 22, 2011), available at http://dis.puc.state.oh.us/TiffToPDF/A1001001A11 F22B41223H86128.pdf. Strict compliance with the NFG Code is not, however, always necessary to remedy a safety issue. *Id.* Although strict compliance is a safe harbor, customers may also pursue alternative solutions that achieve the same level of safety that the code demands. *Id.*

{¶ 53} There will always be some period of time between Columbia's identification of a safety hazard and a customer's demonstration of compliance, be it prescriptive compliance or alternative compliance. Unfortunately, the commission's order provides no guidance as to how Columbia should proceed during this interim period. Columbia's current practice is to immediately shut off service to red-tagged, unsafe appliances until the customer shows that the appliance complies with safety standards. The commission's order does not address whether Columbia can continue this practice or whether Columbia must continue to provide service while the customer works toward achieving or

demonstrating compliance. The commission acknowledged this open question,[4] but failed to answer it. Pub. Util. Comm. No. 08-1091-GA-CSS (Aug. 17, 2011), at 9-10, available at http://dis.puc.state.oh.us/TiffToPDF/A1001001A11H 17B15644J85824.pdf.

{¶ 54} Accordingly, I must respectfully disagree with the majority's view that the commission's order provides clear guidance to Columbia. I would remand for the commission to determine whether Columbia may refuse to provide service until a customer demonstrates safety compliance or whether Columbia must continue to provide service while the customer works toward compliance.

O'CONNOR, C.J., and LANZINGER, J., concur in the foregoing opinion.

_____

Isaac, Wiles, Boyle, Burkholder & Teetor, L.L.C., Brian M. Zets, and Thomas L. Hart, for intervening appellee Cameron Creek Apartments.

Porter, Wright, Morris & Arthur, L.L.P., Eric B. Gallon, and Mark S. Stemm; and Charles McCreery, Stephen B. Seiple, and Brooke Leslie, for appellant.

Michael DeWine, Attorney General, and William L. Wright, Thomas W. McNamee, and Devin D. Parram, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

_____

---

4. As the commission wrote, "Columbia questions whether it can terminate, or refuse to connect, natural gas service immediately, and then give the customer time to provide the necessary evidence [of safety], or whether it must allow the customer to keep operating in violation of the NFG Code, until it can be determined [whether the appliance meets an alternative compliance method]." Pub. Util. Comm. No. 08-1091-GA-CSS (Aug. 17, 2011), at 9-10, available at http://dis.puc.state.oh.us/TiffToPDF/A1001001A11H17B15644J85824.pdf.