Lundberg Stratton, J.
Background
{¶ 1} This is an appeal as of right by Monongahela Power Company (“Mon Power”) from decisions of the Public Utilities Commission of Ohio in In the Matter of the Application of the Monongahela Power Co. for Approval of a Market-Based Standard Serv. Offer & Competitive Bidding Process (Oct. 22, 2003) case No. 03-1104-EL-ATA, 2003 WL 22472140 (the “MBSSO case”). Mon Power was the applicant, and Industrial Energy Users-Ohio (“IEU”) was an intervening party in the MBSSO case. IEU has also intervened as an appellee in this appeal.
{¶ 2} The legal backdrop for this appeal is Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962, 7992 (“S.B. 3”), codified primarily at R.C. 4928.01 et seq., which restructures Ohio’s electric-utility industry so as to achieve retail competition in the generation component of electric-utility service. Under S.B. 3, utilities supplying electric service in Ohio were required to file transition plans for approval by the commission. R.C. 4928.31. Key to these transition plans were the unbundling of the three main components of electric service — generation, transmission, and distribution — and developing a “rate unbundling plan.” R.C. 4928.31(A)(1). The unbundled retail rates, including rates for generation service, were capped and frozen for a limited transition period known as the “market development period” (“MDP”). After that period, a utility is entitled to charge market-based retail-generation rates that permit it to recover its cost of purchasing power at wholesale for resale to its customers. R.C. 4928.14.
{¶ 3} On June 22, 2000, in its restructuring case, Mon Power entered into a settlement agreement, styled a “Stipulation and Recommendation” (“the Stipulation”), with the commission’s staff and with representatives of Mon Power’s Ohio retail customers. The Stipulation purported to resolve all issues pertinent to Mon Power’s statutorily required transition plan. The commission approved the Stipulation in its October 5, 2000 opinion and order in its case No. 00-02-EL-ETP, 2000 WL 1873291 (the “ETP[1] Order”).
*573 {¶ 4} On April 24, 2003, Mon Power filed an application in the MBSSO case, seeking commission approval of a market-based standard service offer and a competitive bidding process to follow the MDP, which Mon Power asserts ended December 31, 2003. On July 24, 2003, the commission issued an order allowing Mon Power to solicit bids for power to serve its large commercial, industrial, and street-lighting customers. Mon Power then conducted the bidding process. Only two qualifying bids were received, the lower of which was from an affiliate of Mon Power.
{¶ 5} On October 22, 2003, the commission issued an order in the MBSSO case (“the MBSSO Order”) denying approval of the winning bid and requiring Mon Power to continue its MDP to December 31, 2005, based on a finding that neither of the controlling statutory conditions for early ending of the MDP had been satisfied. Mon Power then filed an application for rehearing, which was denied on December 17, 2003. This appeal ensued.
MDP and its Early Ending
{¶ 6} While the subject of this appeal is the MBSSO Order issued on October 22, 2003, we must consider the ETP Order and the Stipulation that the commission approved in the ETP Order. In addition, we must focus on the meanings of the Stipulation’s provisions.
{¶ 7} Central to this appeal is whether the Stipulation approved by the commission in the ETP Order shortened Mon Power’s MDP with respect to its large commercial and industrial customers. The MDP is a statutorily defined term: “ ‘Market development period’ for an electric utility means the period of time beginning on the starting date of competitive retail electric service and ending on the applicable date for that utility as specified in section 4928.40 of the Revised Code, irrespective of whether the utility applies to receive transition revenues under this chapter.” R.C. 4928.01(A)(17). The starting date of competitive retail electric service was January 1, 2001. R.C. 4928.01(A)(29). Thus, Mon Power’s MDP began on that date.
{¶ 8} The end of the MDP is also specified by statute. R.C. 4928.40(B)(2) provides:
{¶ 9} “For purposes of this chapter, the market development period shall not end earlier than December 31, 2005, unless, upon application by an electric utility, the commission issues an order authorizing such earlier date for one or more customer classes as is specified in the order, upon a demonstration by the utility and a finding by the commission of either of the following:
{¶ 10} “(a) There is a twenty per cent switching rate of the utility’s load by the customer class.
{¶ 11} “(b) Effective competition exists in the utility’s certified territory.”
*574 {¶ 12} Based on these statutory provisions, we conclude that Mon Power’s MDP could end no later than December 31, 2005, but that it could end earlier if pertinent criteria are met.
{¶ 13} Mon Power argues that the commission approved an early end of its MDP as to its large commercial and industrial customers when, in the ETP Order, the commission approved the Stipulation that provided in Section IV: “For customers on the Company’s Rate Schedule C with a demand greater than 300 kW, Rate Schedules CSH, D, K, P, and street lighting, the market development period shall be a three year period and end December 31, 2003.” (Emphasis added.) Mon Power further asserts: “Section IV of the Stipulation recognized that R.C. 4928.40(B)(2) provides that the market development period may not end earlier than December 31, 2005, unless, upon application by the electric utility, the Commission authorizes an earlier termination date for one or more customer classes based upon either a finding of a 20 percent switching rate of load by the customer class or that effective competition exists in the utility’s certified territory. Accordingly, in § IV of the Stipulation, Mon Power made an application to end the market development period early for its large commercial and industrial customers.”
{¶ 14} Mon Power argues that by adopting the Stipulation in its ETP Order, the commission approved the early ending of the MDP for large commercial and industrial customers with no contingency involving future proceedings or future findings by the commission. Mon Power bases its argument on the observation that Section IV of the Stipulation provides that the MDP for small (300kW and below) commercial customers was not shortened and that, in order to end the MDP for those customers early, Mon Power would have to make separate application in the future under R.C. 4928.40(B)(2): “For either Schedule B customers and/or Schedule C customers having demands of 300 kW and below, the market development period can be terminated at any time by the Company making a filing with the Commission showing a 20% switching rate or effective competition.” Mon Power argues that since the Stipulation contains a specific qualification of further commission approval to shorten the MDP for small commercial customers but does not impose such a qualification on Mon Power to shorten the MDP for its large commercial and industrial customers, no such qualification exists.
{¶ 15} Mon Power argues further that the only qualification on the commission’s approval of the transition plan and the Stipulation in the ETP case was final approval of Mon Power’s compliance tariffs and that Mon Power distributed its proposed compliance tariffs to all of the parties in the ETP case, including the commission’s staff, for their review. The tariff sheets distributed for review and subsequently approved by the commission “expressly provided that the default *575 retail electric generation services offered to large commercial and industrial customers would end December 31, 2003 — at the end of the market development period for those customers.”
{¶ 16} The commission and intervening appellee IEU contend that the commission’s approval of Section IV of the Stipulation in the ETP Order did not have the effect of authorizing a shortened MDP for Mon Power’s large commercial and industrial customers. They contend that the commission’s approval not only did not have that effect, it simply could not have had that effect.
{¶ 17} They argue correctly that the only way the MDP can be ended before December 31, 2005, is by compliance with R.C. 4928.40(B)(2). That statutory provision contains four steps: (1) an application by the electric utility to shorten the MDP; (2) a demonstration by the utility that (a) there is a 20 percent switching rate of the utility’s load by the customer class or (b) effective competition exists in the utility’s service territory; (3) based on the utility’s demonstration, a commission finding of the requisite switching rate or effective competition; and (4) based on such finding, a commission order authorizing a shortened MDP.
{¶ 18} The commission readily concedes that Section IV of the Stipulation evidences that Mon Power took the first step to shorten its MDP for large commercial and industrial customers. In Section IV of the Stipulation, Mon Power made application to the commission for approval of a shortened MDP: “By this Stipulation, Monongahela Power, supported by the other Signatory Parties, applies to the Commission for authorization of a market development period termination date for industrials and large commercial customers of December 31, 2003, based upon agreement to forego the recovery of transition costs beyond that date (see Ohio Revised Code § 4928.38).”
{¶ 19} The next requisite statutory step is a demonstration by the utility that either effective competition exists or there is a 20 percent customer switching rate. However, there is nothing in the Stipulation or in the ETP Order indicating that Mon Power made a showing of the existence of the requisite competition or switching rate. Indeed, Mon Power could not have made such a showing because the ETP Order was issued October 5, 2000, almost three months prior to the starting date of competitive retail electric service on January 1, 2001, as provided in R.C. 4928.01(A)(29). Thus, at the date of the ETP Order, there was no competitive retail electric service. Mon Power could not have demonstrated the existence of effective competition, and the commission could not have made a finding of the existence of any competition, much less the existence of effective competition. Moreover, at the date of the ETP Order, the certified-territory law was still in effect, outlawing competition and making it illegal for customers to switch to other providers of electric-generation service.
*576 {¶ 20} The commission argues that the statutorily required demonstration of a 20 percent switching rate or the existence of effective competition speaks in the present tense. Mon Power, on the other hand, argues that the second paragraph of R.C. 4928.40(A) provides the factors that the commission must consider in determining the subjective condition of “[ejffective competition” as used in R.C. 4928.40(B) and that each of those factors is capable of determination before the start date for actual competition. According to Mon Power, “[ijndeed, two of the three factors — transition costs and shopping incentives — are statutorily required to be addressed in the utility’s transition plan. See R.C. 4928.34(A)(12); R.C. 4928.37; Ohio Admin. Code § 4901:1-20-03.”
{¶ 21} Mon Power argues that, considering the factors mentioned in the second paragraph of R.C. 4928.40(A), the commission could and, in fact, did determine in the Stipulation approved in the ETP Order that the effective competition prescribed in R.C. 4928.40(B) could be determined before the start of actual competition.
{¶ 22} As to the requisite switching or effective competition, we consider the commission’s position more plausible and persuasive than Mon Power’s.
(¶ 23} Mon Power’s position is the only one it can take as to the requirements of R.C. 4928.40(B). Yet it ignores the fact that R.C. 4928.40(B) contains two requisites. The first is that a 20 percent switching rate or effective competition must be demonstrated by the utility. Mon Power has failed to show how it made any such demonstration either in the Stipulation approved in the ETP Order or by way of testimony or evidence presented in the proceedings resulting in the MBSSO Order. The second requisite is a finding by the commission of a 20 percent switching rate or effective competition. The commission made no finding about the 20 percent switching rate or competition in its ETP Order, and in its MBSSO Order, it made specific findings that they did not occur.
{¶ 24} Therefore, we conclude as follows: The only way that Mon Power’s MDP for large commercial and industrial customers could have been ended before December 31, 2005, was by compliance with R.C. 4928.40. Furthermore, although Mon Power properly applied to the commission for authority to end the MDP at pi earlier date, Mon Power failed to demonstrate to the commission that the requisite switching rate or effective competition had been or would be achieved by any given date, and the commission did not find that the requisite switching rate or effective competition had been achieved by December 31, 2003. Indeed, in the MBSSO Order, the commission specifically found that the requisite switching rate or effective competition had not been achieved.
{¶ 25} Mon Power professes that as of the date of the ETP Order and continuing to the present, its corporate belief has been that the ETP Order had the effect of ending its MDP for large commercial and industrial customers as of *577 December 31, 2003. We are also convince^ that the commission believed that its ETP Order had that effect. The' commission said so in the ETP Order. Moreover, the commission approved Mon( Power’s compliance tariffs that said so, and on the day of the ETP Order, the commission issued a press release that contained the following statement: “Under the terms of the stipulation, which was adopted in the order, the market development period ends for large customers (industrial and large commercial) on December 31, 2003, and for small customers (residential and small commercial) on December 31, 2005.”
{¶ 26} Nevertheless, to the extent that Section IV of the Stipulation approved by the commission in the ETP Order can be considered an order authorizing the early end of Mon Power’s MDP, that order was premature. It was based upon an optimistic assumption that the requisite levels of the switching rate or effective competition would be achieved by December 31, 2003, an assumption that proved to be unwarranted, making any such order ending the MDP unenforceable because the order exceeded the statutory authority of the commission.
{¶ 27} We conclude that, as a matter of law, the ETP Order did not end Mon Power’s MDP as to its large commercial and industrial customers before December 31, 2005.
Mon Power’s Other Arguments
{¶ 28} Mon Power argues that the commission was bound by its decision in the ETP Order that Mon Power’s MDP for its large commercial and industrial customers would end on December 31, 2003. Therefore, asserts Mon Power, the commission erred when it extended the MDP in the MBSSO Order. Mon Power’s argument that the commission was bound by the ETP Order is based on estoppel, the Contracts Clause of the United States Constitution, and issue preclusion. Application of these doctrines to the facts, however, is based upon the premise that the ETP Order created a legally binding early termination of Mon Power’s MDP for its large commercial and industrial consumers. Since we have determined that the commission had no authority to enter into such an agreement contrary to the statute, the consideration of these theories is moot. Therefore, none of the legal doctrines suggested by Mon Power have application under the facts before us.
Standard of Review
{¶29} R.C. 4903.13 provides that a commission order shall be reversed, vacated, or modified by this court only if, upon consideration of the record, the court finds the order to be unlawful or unreasonable. Under this statutory standard, “this court will not reverse or modify a PUCO decision as to questions of fact where the record contains sufficient probative evidence to show the *578 PUCO’s determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty.” AT&T Communications of Ohio, Inc. v. Pub. Util. Comm. (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371, citing MCI Telecommunications Corp. v. Pub. Util. Comm. (1988), 38 Ohio St.3d 266, 268, 527 N.E.2d 777. This court has consistently refused to substitute its judgment for that of the commission on evidentiary matters. AK Steel Corp. v. Pub. Util. Comm. (2002), 95 Ohio St.3d 81, 84, 765 N.E.2d 862. As the court noted in AK Steel (a case that also addressed the electric-utility transition issues for a different electric utility), the appellant bears the burden of demonstrating that the commission’s decision is against the manifest weight of the evidence or is clearly unsupported by the record. Id. at 86, 765 N.E.2d 862. This burden is difficult to sustain because the court has consistently found it proper to defer to the commission’s judgment in matters that require the commission to apply its specialized expertise and discretion, as it did below, with regard to factual matters now on appeal. Cincinnati Bell Tel. Co. v. Pub. Util. Comm. (2001), 92 Ohio St.3d 177, 179-180, 749 N.E.2d 262; AT&T Communications of Ohio, Inc. v. Pub. Util. Comm. (1990), 51 Ohio St.3d 150, 154, 555 N.E.2d 288; Cleveland Elec. Illum. Co. v. Pub. Util. Comm. (1976), 46 Ohio St.2d 105, 107-108, 75 O.O.2d 172, 346 N.E.2d 778.
{¶ 30} “Due deference should be given to statutory interpretations by an agency that has accumulated substantial expertise and to which the General Assembly has delegated enforcement responsibility.” Weiss v. Pub. Util. Comm. (2000), 90 Ohio St.3d 15, 17-18, 734 N.E.2d 775, citing Collinsworth v. W. Elec. Co. (1992), 63 Ohio St.3d 268, 272, 586 N.E.2d 1071.
{¶ 31} To the extent that Mon Power’s assertions of error are directed at factual determinations of the commission, Mon Power has failed to show that the record so lacked sufficient probative evidence as to show misapprehension, mistake, or willful disregard of duty on the part of the commission or that the commission’s determinations were against the manifest weight of the evidence. To the extent that Mon Power’s assertions of error are directed at the commission’s exercise of discretion or judgment based on the commission’s expertise, Mon Power has failed to convince us that this court should substitute its judgment for that of the commission.
Conclusion
{¶ 32} Based on the foregoing, we conclude that the decisions of the commission were reasonable and lawful, and we therefore affirm them.
Decisions affirmed.
Resnick, F.E. Sweeney, O’Connor and O’Donnell, JJ., concur.
*579 Moyer, C.J., dissents.
Pfeifer, J., dissents.

. ETP stands for Electric Transition Plan.