[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Alamo Solar I, L.L.C.*, Slip Opinion No. 2023-Ohio-3778.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2023-OHIO-3778

IN RE APPLICATION OF ALAMO SOLAR I, L.L.C., FOR A CERTIFICATE OF ENVIRONMENTAL COMPATIBILITY AND PUBLIC NEED; CONCERNED CITIZENS OF PREBLE COUNTY, L.L.C, ET AL., APPELLANTS; POWER SITING BOARD, APPELLEE; ALAMO SOLAR I, L.L.C., INTERVENING APPELLEE.

IN RE APPLICATION OF ANGELINA SOLAR I, L.L.C., FOR A CERTIFICATE OF ENVIRONMENTAL COMPATIBILITY AND PUBLIC NEED; CONCERNED CITIZENS OF PREBLE COUNTY, L.L.C, ET AL., APPELLANTS; POWER SITING BOARD, APPELLEE; ANGELINA SOLAR I, L.L.C., INTERVENING APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Alamo Solar I, L.L.C.*, Slip Opinion No. 2023-Ohio-3778.]

*Power Siting Board—R.C. 4906.10(A)—Solar-powered electric-generation facilities—Applications for certificates of environmental compatibility and public need—Power Siting Board's orders granting certificates affirmed.*

(Nos. 2022-0053 and 2022-0054—Submitted April 18, 2023—Decided October 18, 2023.)

APPEALS from the Power Siting Board, Nos. 18-1578-EL-BGN and 18-1579-EL-BGN.

_____

**DEWINE, J.**

{¶ 1} This matter concerns two large solar farms proposed to be built in Preble County. The General Assembly has authorized commercial solar farms in Ohio but has made their construction conditional on approval by the Ohio Power Siting Board. Before a large solar farm may be built, the board must determine that the solar farm complies with certain statutory criteria.

{¶ 2} The board ultimately approved the two solar farms at issue. It did so after its staff agreed to stipulations with the two solar farms, various local governments, and the Ohio Farm Bureau. The stipulations impose a number of conditions on the construction and operation of the facilities. In this appeal, a citizens group and some nearby residents challenge the board's orders approving the facilities. The legislature has instructed that we may reverse a board order only if we find it to be unlawful or unreasonable. Because neither has been established, we affirm the orders of the Power Siting Board.

## I. BACKGROUND

{¶ 3} In this opinion, we deal with two separate appeals. In the first case, the board granted Alamo Solar I's application for a certificate to build a solar-powered electric-generation facility in Gasper and Washington Townships in Preble County. In the second case, the board granted Angelina Solar I's application for a certificate to build a solar-powered electric-generation facility in Israel and Dixon Townships in Preble County.

{¶ 4} A group called Concerned Citizens of Preble County, L.L.C., has appealed the board's order in each case. Certain individual members of the group

are also appellants in the respective cases. (This opinion will refer to all of the appellants as "the citizens.") In both appeals, the citizens present nearly identical propositions of law and arguments. We consolidated the cases for oral argument, and we now do so for purposes of this decision.

{¶ 5} Alamo and Angelina filed applications in late 2018 seeking the board's approval to construct their respective facilities. Each solar farm will contain large arrays of ground-mounted solar panels, as well as support facilities such as access roads, meteorological stations, buried electricity-collection lines, inverter pads, and a substation. Because the solar farms will have the capacity to generate more than 50 megawatts of electricity, they must obtain board approval prior to construction. R.C. 4906.01(B)(1)(a) and 4906.04.

{¶ 6} In 2019, joint stipulations and recommendations were filed in each case. The stipulations were intended to resolve all matters relevant to certification and construction of the facilities. In each case, the stipulations were agreed to by the applicant, board staff, the Preble County Commissioners, the Preble County Engineer, the Preble County Planning Commission, the Preble County Soil and Water Conservation District, and the Ohio Farm Bureau. The trustees of the townships in which the facilities are to be located (Gasper and Washington for Alamo, and Israel and Dixon for Angelina) also joined the respective stipulations. The citizens did not join either stipulation.

{¶ 7} After the board conducted evidentiary hearings on both stipulations, the parties filed amended and restated stipulations and recommendations with the board.[1] The board then held supplemental hearings in each case to consider testimony supporting and opposing the amended stipulations.

{¶ 8} In June 2021, the board issued an opinion and order in each case approving the amended stipulations, subject to certain conditions, and granting

---

1. All parties signed the amended joint stipulations except for Israel Township.

certificates for the construction of the facilities. After unsuccessfully seeking rehearing, the citizens filed an appeal in each case. Alamo and Angelina have intervened in their respective cases and urge us to affirm the board's orders.

## II. ANALYSIS

**{¶ 9}** The General Assembly has established standards for the construction of major utility facilities in Ohio and delegated to the Power Siting Board the authority to implement those standards. Before the board may issue a certificate for the construction of a major utility facility, it must make eight substantive determinations. R.C. 4906.10(A). Two of the determinations are at issue in this appeal. Specifically, "[t]he board shall not grant a certificate * * * unless it finds and determines":

> (2) [t]he nature of the probable environmental impact;
>
> (3) [t]hat the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations.

Central to the citizens' arguments is a claim that the board misinterpreted and misapplied its own rules by not requiring Alamo and Angelina to submit all the information required by those rules. They contend that as a result, the board did not have the information it needed to determine the nature of the probable environmental impact of the proposed facilities and whether the proposed facilities represent the minimum adverse impact.

**{¶ 10}** Our standard of review is prescribed by statute. We may reverse, modify, or vacate an order of the board only when, upon consideration of the record, we conclude that the order is "unlawful or unreasonable." R.C. 4903.13 and 4906.12. The citizens bear the burden of establishing that the orders are unlawful

4

or unreasonable. *See In re Complaint of Reynoldsburg*, 134 Ohio St.3d 29, 2012-Ohio-5270, 979 N.E.2d 1229, ¶ 18; *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29.

{¶ 11} The term "unlawful" in the standard refers to our review of legal questions. *In re Application of Firelands Wind, L.L.C.*, __ Ohio St.3d __, 2023-Ohio-2555, __ N.E.3d __, ¶ 12. The question whether the board followed its own regulations is a legal question. *Id.* Our review of questions of law is de novo. *In re Application of Duke Energy Ohio, Inc.*, 166 Ohio St.3d 438, 2021-Ohio-3301, 187 N.E.3d 472, ¶ 11.

{¶ 12} The board and the solar farms maintain that we should defer to the board's interpretation of the statutory scheme.[2] But we recently rejected the notion that a court must defer to an agency's interpretation of a statute that it is tasked with implementing. *TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, ___ Ohio St.3d ___, 2022-Ohio-4677, ___ N.E.3d ___,

---

2. The opinion concurring in part states that "[n]o party in this case has requested that this court afford deference to the board in its interpretation of any law or regulation." Concurring opinion, ¶ 75. That is incorrect. *See, e.g.*, Power Siting Board Brief at 7 (case No. 2022-0053), quoting *In re Fuel Adjustment Clauses for Columbus S. Power Co. & Ohio Power Co.*, 140 Ohio St.3d 352, 2014-Ohio-3764, 18 N.E.3d 1157, ¶ 23, quoting *Office of Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979) ("The Court has customarily relied on the expertise of a state agency in interpreting a law where ' "highly specialized issues" ' are involved and ' "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly" ' "); *id.* at 11 (quoting *In re Columbus S. Power Co.*, 134 Ohio St.3d 392, 2012-Ohio-5690, 983 N.E.2d 276, ¶ 36, quoting *Office of Consumers' Counsel* at 110, for the proposition that this court " 'will defer to the commission's interpretation of a statute "where there exists disparate competence between the respecting tribunals in dealing with highly specialized issues" ' "); Alamo Brief at 12 (case No. 2022-0053) and Angelina Brief at 11 (case No. 2022-0054), quoting *Office of Consumers' Counsel* at 110 ("[T]his Court relies on the expertise of a state agency in interpreting a law when 'highly specialized issues' are involved and 'where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly' ").

Moreover, the citizens repeatedly challenge the board's determinations about whether Alamo and Angelina complied with the board's regulations. These arguments contest both the board's interpretation of its regulations and the board's factual determinations. Thus, it is helpful to clarify our standard for reviewing the board's legal and factual determinations at the outset.

¶ 3 ("the judicial branch is *never* required to defer to an agency's interpretation of the law" [emphasis in original]).

**{¶ 13}** This case also presents a related issue: whether a court must give deference to an agency's interpretation of its own regulations. The citizens repeatedly argue that the board incorrectly interpreted its own regulations.[3] Under federal doctrine, a federal court must defer to an agency's interpretation of an ambiguous regulation that the agency has promulgated. *See Auer v. Robbins*, 519 U.S. 452, 461, 137 L.Ed.2d 79, 117 S.Ct. 905 (1997). But the same separation-of-powers principles that led us to reject *Chevron*-style deference in *TWISM* also apply to deference of the *Auer* variety. *Compare TWISM* at ¶ 3, 29 *with Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 865, 81 L.Ed.2d 694, 104 S.Ct. 2778 (1984).

**{¶ 14}** When a court defers to an agency's interpretation of its own regulation, it allows the agency to assume the legislative power (the rule drafter), the judicial power (the rule interpreter), and the executive power (the rule enforcer). Doing so violates the fundamental precept that the power of lawmaking and law exposition should not be concentrated in the same hands. *See generally* Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 Colum.L.Rev. 612; *see also id.* at 645, quoting Montesquieu, *The Spirit of the Laws* bk. XI, ch. 6, at 157 (Anne Cohler et al. eds. & trans., 1989) (1768) (" 'when legislative power is united with executive power * * * in a single body * * * there is no liberty' "). Thus, we will independently interpret the regulations at issue in these cases. If the text of a regulation is clear, then we apply it as written and stop right there. But if we determine that the text is ambiguous,

---

3. *See, e.g.*, Citizens' Brief at 22 (case No. 2022-0053) ("The board acted unreasonably and unlawfully by approving the Project without requiring Alamo to accurately model the noise levels * * *, in violation of the requirement in Ohio Admin.Code 4906-4-08(A)(3)(b)"); Citizens' Brief at 27 (case No. 2022-0054) ("The board's failure to require Angelina to provide [this noise data] violates Ohio Admin.Code 4906-4-08(D)(4)(e)").

we may consider the board's interpretation only for its persuasive power. *See TWISM* at ¶ 44-45.

{¶ 15} The "unreasonable" part of the standard of review comes into play when we examine the board's determinations of "[t]he nature of the probable environmental impact" of each facility and its determinations that each facility "represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations," R.C. 4906.10(A)(2) and (3). The statute dictates that the board must make these determinations, not this court.

{¶ 16} Here, our review is not of a legal question but of the board's exercise of its implementation authority that it was granted by the legislature. We review the board's exercise of its implementation authority in making these determinations for reasonableness. *Firelands Wind*, __ Ohio St.3d __, 2023-Ohio-2555, __ N.E.3d __, at ¶ 15. We examine the reasonableness of an agency's decision about such things as whether a facility represents the "minimum adverse environmental impact," R.C. 4906.10(A)(3), by looking to whether the agency's decision falls within a zone of permissible statutory construction. *Firelands Wind* at ¶ 15. We also may find an agency's decision unreasonable when the evidence clearly does not support it, or when an agency's decision is internally inconsistent. *Id.*

{¶ 17} Finally, in adjudicating whether an agency's determination is unreasonable, we do "not * * * reweigh the evidence or second-guess [the agency] on questions of fact." *Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 152 Ohio St.3d 73, 2017-Ohio-7566, 93 N.E.3d 902, ¶ 35. We will not disturb the board's factual determinations "when the record contains sufficient probative evidence to show that the board's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty." *In re Application of*

*Champaign Wind, L.L.C.*, 146 Ohio St.3d 489, 2016-Ohio-1513, 58 N.E.3d 1142, ¶ 7.

{¶ 18} Applying these standards, we conclude that the citizens' arguments lack merit. We find nothing unlawful about the board's adherence to the information requirements of its regulations. As we will explain, in some instances, the board's rules do not require that Alamo or Angelina provide the information that the citizens allege. In other instances, Alamo's and Angelina's applications contain the information that the citizens claim is missing. Similarly, we find nothing unreasonable about the board's determination of the "nature of the probable environmental impact" or its determination that each facility "represents the minimum adverse environmental impact," R.C. 4906.10(A)(2) and (3).

## A. Waiver of Right to Object to Completeness of the Applications

{¶ 19} Before we get to the merits of the citizens' objections, we need to deal with a preliminary matter. The solar farms maintain that the citizens waived their right to challenge the technical completeness of their applications by failing to object during the proceedings before the board.

{¶ 20} Ohio Adm.Code 4906-3-06(A)(1) and (2) provide that within 60 days of receiving an application, the board chair shall either accept it as complete or reject it as incomplete with a statement explaining the basis of the rejection. Alamo and Angelina argue that the citizens waived their argument that the applications were incomplete by not objecting when the board determined that the applications were complete.

{¶ 21} In their reply briefs, however, the citizens have clarified that they are not challenging the technical completeness of the applications. ("Although all applications must contain the information mandated by rule, the Citizens do not rely on that position on appeal. * * * [The Citizens] did raise this issue below, but they are not pursuing it on appeal.") Instead, they represent that their challenge is based "on the lack of evidence in the entire record" to support the board's

determinations. With that understanding, we proceed to consider the citizens' propositions of law.

### B. Proposition of Law No. 1: Noise

{¶ 22} In their first proposition of law, the citizens assert that the board erred by issuing certificates without receiving sufficient information about noise levels of the proposed solar farms and without requiring noise-reduction controls.

{¶ 23} The citizens focus on the anticipated noise from inverters. An inverter takes the direct-current power generated from solar panels and converts it to alternating current, which can be transmitted to the grid. Alamo and Angelina anticipate that the projects will use central inverters, which are typically located in the center of solar arrays and are able to convert electricity from multiple rows of solar panels. But they have not ruled out using string inverters instead, which are smaller and convert power only from a single row (or string) of solar panels.

#### 1. Noise modeling under Ohio Adm.Code 4906-4-08(A)(3)

{¶ 24} As part of their argument, the citizens contend that the board erred in its determination that the solar farms complied with Ohio Adm.Code 4906-4-08(A)(3)'s noise-modeling requirements. That provision says:

> (3) Noise. The applicant shall provide information on noise from the construction and operation of the facility.
>
> * * *
>
> (b) Describe the operational noise levels expected at the nearest property boundary. The description shall address:
>
> (i) Operational noise from generation equipment. In addition, for a wind farm, cumulative operational noise levels at the property boundary for each property adjacent to or within the project area, under both day and nighttime operations. The applicant shall use generally accepted computer modeling software (developed for

wind turbine noise measurement) or similar wind turbine noise methodology, including consideration of broadband, tonal, and low-frequency noise levels.

Ohio Adm.Code 4906-4-08(A).

{¶ 25} Both Alamo and Angelina introduced technical reports on the background sound and the expected noise impact of the facilities. The reports were prepared by David Hessler, an engineer with nearly 30 years of acoustic-design experience. Hessler testified that the noise impact on neighbors would be minimal or nonexistent. In addition, at their respective supplemental hearings, Alamo and Angelina submitted noise-modeling data for central inverters. The citizens contend, however, that the submissions were inadequate because they failed to include modeling for "the operational noise level at each habitable residence, school, church, and other noise-sensitive receptors," Ohio Adm.Code 4906-4-08(A)(3)(c). They also contend that the board misinterpreted the rule's requirements by not mandating that the solar farms submit computer modeling of the expected sound level if either applicant were to use string inverters rather than central inverters.

{¶ 26} The flaw in the citizens' argument is that the administrative-code provision they cite requires modeling at those locations for wind farms—not solar farms. *See* Ohio Adm.Code 4906-4-08(A)(3)(b). Thus, the board did not act unlawfully by not requiring additional computer modeling.

### 2. Central-inverter modeling data

{¶ 27} The citizens contend that the modeling data showed that central inverters will increase background noise at or above 7 dBA[4] at some neighboring property boundaries. They assert that board staff had determined that any increase

---

4. A-weighted decibel—or dBA—is a scale that measures the loudness of sound as perceived by the human ear. *See Champaign Wind*, 146 Ohio St.3d 489, 2016-Ohio-1513, 58 N.E.3d 1142, at ¶ 35.

in background noise that exceeds 5 dBA threshold "produces noise objectionable to the community."

{¶ 28} The citizens claim that the 5 dBA threshold was established in the board staff's reports that were filed in each proceeding. The report says: "No non-participating receptors were modeled to receive noise impacts greater than the daytime ambient noise level plus 5 dBA. Therefore, the project would be expected to have minimal adverse noise impacts on the adjacent community." We do not read this language as establishing a 5 dBA upper limit. And in any event, a staff report isn't an order of the board. It's just the findings of board staff after their investigation, and those findings aren't binding on the board. *See* R.C. 4906.07(C); *Akron v. Pub. Util. Comm.*, 55 Ohio St.2d 155, 157, 378 N.E.2d 480 (1978).

{¶ 29} The record contains substantial evidence supporting the board's conclusion in each case that sound emissions from the facility "should not have any negative impact in the surrounding community," *In re Application of Alamo Solar I, L.L.C., for a Certificate of Environmental Compatibility and Public Need*, Power Siting Board No. 18-1578-EL-BGN, ¶ 237 (June 24, 2021); *In re Application of Angelina Solar I, L.L.C., for a Certificate of Environmental Compatibility and Public Need*, Power Siting Board, No. 18-1579-EL-BGN, ¶ 227 (June 24, 2021). We reject the citizens' contention that the central-inverter modeling data established otherwise.

### 3. Additional noise-control measures

{¶ 30} The citizens claim that the board erred by failing to require Alamo and Angelina "to equip the inverters with noise controls, such as cabinet damping or ventilation silencers, even though these devices are effective and available." Based on the evidence submitted, however, the board determined that such noise controls were unnecessary. Moreover, the record demonstrates that the inverters can easily be retrofitted with equipment to reduce noise if necessary. Alamo and

Angelina both committed in the amended stipulations to promptly make such retrofits if the need should arise.

**{¶ 31}** Based on the foregoing, we find nothing unlawful in the board's compliance with its own regulations. And we find nothing unreasonable in the board's determinations about the solar farms' expected environmental impact. We reject the citizens' first proposition of law.

### C. Proposition of Law No. 2: Visual Impact

**{¶ 32}** Ohio Adm.Code 4906-4-08(D)(4) requires applications to include information regarding the facility's expected visual impact. As part of their applications, Alamo and Angelina submitted visual-resource assessments prepared by Matthew Robinson, a landscape architect, and his firm. The Alamo assessment concluded that the project will "not have an undue adverse effect on aesthetic resources or a significant number of viewers within the study area." Similarly, the Angelina assessment concluded that the solar farm "will be screened from view in approximately 83.2% of the visual study area." In their second proposition of law, the citizens make various claims that the visual-impact evidence submitted by the solar farms was insufficient.

### *1. Photographic simulations: Ohio Adm.Code 4906-4-08(D)(4)(e)*

**{¶ 33}** To start, the citizens contend that the board failed to ensure compliance with Ohio Adm.Code 4906-4-08(D)(4)(e), which requires that an applicant:

> [p]rovide photographic simulations or an artist's pictorial sketches of the proposed facility from public vantage points that cover the range of landscapes, viewer groups, and types of scenic resources found within the study area.

Robinson's reports included photographic simulations of the proposed facilities from public vantage points. The citizens raise two objections to these simulations.

{¶ 34} First, the citizens complain that only eight-foot solar panels were depicted even though the solar farms could install panels up to 14 feet high. But Robinson testified that the simulations depicted eight-foot solar panels rather than 14-foot panels because eight feet was the most likely height of the panels. Further, Robinson testified that if he were to conduct the visual simulations with a panel height of 14 feet, it would not change his conclusions.

{¶ 35} Second, the citizens claim that because the board allowed simulations that did not convey how the projects will appear to the closest, most impacted neighbors, it misread the mandate in Ohio Adm.Code 4906-4-08(D)(4)(e), which requires such simulations to "cover the range of landscapes [and] viewer groups." The third condition in the amended stipulations filed in each case requires that perimeter fences be set back at least 25 feet from neighbors' property lines and 150 feet from houses. The citizens complain that the simulations filed with the applications did not depict views from these distances but instead depicted views from 300 to 900 feet away. But the setbacks in the amended stipulations were not agreed to until July 2020, more than 18 months after Alamo and Angelina filed their applications. Thus, the solar farms could not have accounted for the revised setback distances in their applications. Moreover, Ohio Adm.Code 4906-4-08(D)(4)(e) requires only photographic simulations from "public vantage points." The regulation does not require Alamo and Angelina to provide photographic simulations from the vantage point of private property.

### 2. Mitigation of adverse visual impacts

{¶ 36} The citizens also argue that Alamo and Angelina failed to comply with Ohio Adm.Code 4906-4-08(D)(4)(f). That provision requires the applicant to "[d]escribe measures that will be taken to minimize any adverse visual impacts created by the facility, including, but not limited to, project area location, lighting,

* * *, visual screening, and facility coloration." *Id.* The citizens claim that the solar farms violated this provision because their applications contained only references to certain mitigating measures they were "considering," rather than firm commitments to implement any mitigating measures.

{¶ 37} Contrary to the citizens' assertion, Alamo's and Angelina's applications described specific mitigation measures that *will* be incorporated into their project designs, as well as other measures that are being considered for the projects. Definite measures include installing electricity-collection lines underground, constructing solar arrays on existing grades that follow the existing topography of the project area, and planting native grasses in the solar field and under arrays. Alamo and Angelina are also considering planting native shrubs and trees along fence lines adjacent to residences to soften the overall visual effect of the projects and integrate the projects into the surrounding landscape.

{¶ 38} Notwithstanding these measures, the citizens fault the solar farms for failing to include a *binding* landscape plan in their applications so that neighbors could adjudicate the details and adequacy of the vegetative screening chosen for the project. But the administrative-code provision at issue doesn't require that the applicant commit to any specific type of visual screening; nor does it require the applicant to include a landscape plan with the application, let alone a binding one.

{¶ 39} The citizens also argue that the board misinterpreted the rule requiring a description of steps to mitigate visual impacts, Ohio Admin.Code 4906-4-08(D)(4)(f), by permitting Alamo and Angelina to file a post certification landscape plan. The stipulations require the plans to be developed in consultation with a licensed landscape architect and include mitigation measures such as fencing, vegetative screening, and good-neighbor agreements. The citizens contend that by granting certification before binding landscape plans are filed, the board improperly delegated authority to board staff and deprived the public of a fair opportunity to have the adequacy of the screening plans adjudicated. They further

maintain that these conditions provide ambiguous parameters and lack enforceable standards.

{¶ 40} Contrary to the citizens' assertion, they were not deprived of an opportunity to be heard on the mitigation measures required by the stipulations. During the hearings on the amended stipulations, Alamo and Angelina introduced a preliminary visual-impact mitigation plan that showed how setbacks and vegetative screening will be incorporated into the projects. The citizens were able to cross-examine Alamo's and Angelina's witnesses on the preliminary plan. Moreover, the stipulated conditions expressly require that if the solar companies and neighboring property owners are unable to agree to alternative screening measures, the landscape plans must provide vegetative screening that will "enhance the view from the residence and be in harmony with the existing vegetation and viewshed." In addition, the conditions require that the vegetative screenings be maintained for the life of the solar farms and that failed plantings be replaced.

{¶ 41} We find nothing unlawful in the board's actions. R.C. 4906.10(A) empowers the board to grant a siting certificate "upon such terms, condition, or modifications of the construction, operation, or maintenance" of the facility as the board deems appropriate. Thus, we have upheld the board's authority to impose conditions that are subject to monitoring for compliance by board staff. *See In re Application of Buckeye Wind, L.L.C.*, 131 Ohio St.3d 449, 2012-Ohio-878, 966 N.E.2d 869, ¶ 13-18 (plurality opinion); *In re Application of Icebreaker Windpower, Inc.*, 169 Ohio St.3d 617, 2022-Ohio-2742, 207 N.E.3d 651, ¶ 39-40. Alamo and Angelina must construct their solar facilities in accordance with the conditions established by the board. So even though the board's orders allow Alamo and Angelina to flesh out the details in the final versions of their landscape plans as the construction process evolves, the board did not act unlawfully in approving the facilities subject to these conditions. *See Buckeye Wind* at ¶ 18 (plurality opinion).

### 3. Setbacks

**{¶ 42}** The citizens claim that the stipulated 25-foot setback between the facilities' fences and neighboring property lines is insufficient for vegetative screening. The solar farms presented evidence that a 25-foot setback is sufficient to effectively screen and mitigate each project's visual impact by (1) reducing the perceived scale of the project and (2) providing increased space to allow for more vegetative screening. The citizens, in contrast, failed to cite any evidence that the 25-foot setback is insufficient to mitigate adverse visual impacts. This failure to support a factual argument with record evidence is grounds for rejection. *See In re Application of Columbus S. Power Co.*, 147 Ohio St.3d 439, 2016-Ohio-1608, 67 N.E.3d 734, ¶ 51 (lead opinion); *see also Champaign Wind*, 146 Ohio St.3d 489, 2016-Ohio-1513, 58 N.E.3d 1142, at ¶ 30 (whether setbacks are sufficient to protect the public is an evidentiary issue, and we will not substitute our judgment for the board on evidentiary matters).

**{¶ 43}** The citizens also contend that the board should have required Alamo and Angelina to completely screen the neighbors' homes from intrusive views of solar panels and fences. But they do not point to any legal authority that requires solar farms to be completely screened off from neighboring properties. R.C. 4906.10(A)(3) requires the board to certify "[t]hat the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations." It does not require the elimination of all adverse impacts.

**{¶ 44}** Based on the foregoing, we reject the citizens' second proposition of law.

### D. Proposition of Law No. 3: Wildlife and Plants

**{¶ 45}** In their third proposition of law, the citizens assert that the board acted unlawfully and unreasonably by approving the facilities without receiving sufficient information about the projects' probable impact on animals and plants.

{¶ 46} The citizens' arguments center on Ohio Adm.Code 4906-4-08(B)(1), which requires an applicant to "provide information regarding ecological resources in the project area." Under that regulation, the applicant must

> [p]rovide the results of a literature survey of the plant and animal life within at least one-fourth mile of the project area boundary. The literature survey shall include aquatic and terrestrial plant and animal species that are of commercial or recreational value, or species designated as endangered or threatened.

Ohio Adm.Code 4906-4-08(B)(1)(c).

{¶ 47} And the applicant must "[c]onduct and provide the results of field surveys of the plant and animal species identified in the literature survey." Ohio Adm.Code 4906-4-08(B)(1)(d). The citizens contend that the board misinterpreted this regulation when it required that Alamo and Angelina conduct a literature search only for species of commercial and recreational value. We disagree.

{¶ 48} Alamo and Angelina retained the same environmental consulting firm, Cardno, to conduct literature and field surveys of plant and animal life within one-quarter mile of the project areas. The Cardno team reviewed literature compiled by several state and federal agencies, including the Ohio Department of Natural Resources and the United States Fish and Wildlife Service. Contrary to the citizens' claim, Cardno's literature surveys include specific discussions of all sorts of birds (including raptors such as bald eagles), bats, and aquatic life in and near the project areas. Likewise, the literature surveys extensively discuss the various plant species in and near the project areas. In short, Alamo's and Angelina's literature surveys satisfy Ohio Adm.Code 4906-4-08(B)(1)(c).

{¶ 49} The Cardno team also conducted three separate field surveys for each of the project sites and the areas within one-quarter mile of the project area

boundaries. Cardno's field surveys were focused on observing habitats for evidence of nesting, roosting, and foraging to determine whether the project sites and surrounding areas were conducive to wildlife before and after construction. In conducting habitat assessments of the project sites and surrounding areas, the Cardno team searched for activity of certain species of bats and birds (including bald eagles and other raptors), as well as endangered and threatened species. The Cardno team also surveyed wetlands to observe wildlife and to determine their ecological viability for animal and aquatic life.

{¶ 50} The citizens claim that Cardno's field surveys were inadequate because all the Cardno team did was "casually note" the rare, threatened, and endangered species that it observed during its surveys of wetlands and streams in the project areas. They maintain that even if the Cardno team happened to observe wildlife during these visits, the team was not searching for wildlife when it surveyed the wetlands and streams.

{¶ 51} We are not persuaded. As an initial matter, the citizens' challenge is to the methodology employed by the Cardno team in conducting field surveys of the animals found in and around the project areas. But nothing in Ohio Adm.Code 4906-4-08(B)(1)(d) prescribes a specific methodology for how field surveys are to be conducted.

{¶ 52} Further, the record does not establish that the Cardno team's methods were unreasonable or its work inadequate. The Cardno team reported that few wildlife species use the areas that were surveyed because each project is to be built mostly on land that has already been cleared and is disturbed annually by agricultural activity. The Cardno team recorded the results of its wildlife field surveys of the project areas, and the results were generally consistent with its conclusion that the project areas provide suitable habitats for only a limited number of wildlife species.

{¶ 53} In the end, the citizens have not shown that Alamo or Angelina failed to comply with Ohio Adm.Code 4906-4-08(B)(1)(c) or (d). As a result, they have failed to demonstrate that the record lacks sufficient evidence to support the board's determinations pertaining to the probable impact of the solar farms on plant and animal life in the project areas. Therefore, we reject their third proposition of law.

### E. Proposition of Law No. 4: Flooding and Stormwater Runoff

{¶ 54} In their fourth proposition of law, the citizens contend that the board misinterpreted the rule governing water quality information, Ohio Admin.Code 4906-4-07(C), to allow it to approve the facilities without obtaining sufficient information about the potential for flooding as a result of stormwater runoff from the facilities.

{¶ 55} Alamo and Angelina presented testimony from Noah Waterhouse, a licensed professional engineer with extensive experience evaluating water issues at solar projects. He testified that the project "should not have an impact on drainage, nor should it result in an increase in runoff." He further opined that the drainage and runoff conditions "should not be dissimilar from a farmed field" containing crops and should be superior to a fallow field.

{¶ 56} The board approved conditions that require the solar farms to follow Ohio EPA programs for the management of stormwater, to implement a stormwater-pollution-prevention plan, and to incorporate the Ohio EPA's "Guidance on Post-Construction Storm Water Controls for Solar Panel Arrays." Matt Marquis, a civil engineer with expertise in stormwater management, confirmed that the conditions "adequately provide for management of any post-construction stormwater flows."

{¶ 57} The citizens contend that the board erred by approving the projects without obtaining information about stormwater runoff and potential flooding, which they assert the board is required to obtain under Ohio Adm.Code 4906-4-07(C). That provision, however, is not directed at flooding and stormwater issues

but at ensuring that projects will comply with federal, state, and local regulations for water pollution. *See* Ohio Adm.Code 4906-4-07(A) ("[t]he information requested in this rule shall be used to determine whether the facility will comply with regulations for air and water pollution, solid and hazardous wastes, and aviation"). Even subsection (C) of the rule, which the citizens cite, calls for the applicant to "provide information on compliance with water *quality* regulations." (Emphasis added.) Ohio Adm.Code 4906-4-07(C).

**{¶ 58}** Flooding is addressed by a different rule, namely Ohio Adm.Code 4906-4-08(A)(4)(e). Under this rule, the applicant is required to "[p]rovide an analysis of the prospects of floods for the area, including the probability of occurrences and likely consequences of various flood stages, and describe plans to mitigate any likely adverse consequences." *Id.* The citizens do not argue that Alamo and Angelina failed to address flooding impacts under this rule.

**{¶ 59}** Based on the foregoing, we reject the citizens' fourth proposition of law.

### F. Proposition of Law No. 5: Pollution Impacts and Mitigation Measures

**{¶ 60}** In their fifth proposition of law, the citizens contend that the solar farms' applications failed to provide adequate information about the quality of surface water flowing from the project areas and failed to provide measures to mitigate potential contaminants discharged into surface waters from the construction of the solar farms.

### 1. Pollution impacts

**{¶ 61}** There are two rules at issue that deal with water quality—one relates to water quality before construction and the other to water quality during construction. Ohio Adm.Code 4906-4-07(C)(1) requires the applicant to "provide information regarding preconstruction water quality and permits." Under subsection (C)(1)(d), the applicant must "[d]escribe the existing water quality of the receiving stream based on at least one-year of monitoring data, using

20

appropriate Ohio environmental protection agency reporting requirements." Ohio Adm.Code 4906-4-07(C)(1)(d). And Ohio Adm.Code 4906-4-07(C)(2) requires the applicant to "provide information regarding water quality during construction." Under subsection (C)(2)(b), the applicant must provide an "estimate of the quality and quantity of aquatic discharges from the site clearing and construction operations." Ohio Adm.Code 4906-4-07(C)(2)(b).

{¶ 62} Regarding the preconstruction rule, the citizens argue that Alamo and Angelina failed to sample and analyze the water quality in streams receiving runoff from the project areas. As for the during-construction rule, the citizens contend that the solar farms failed to provide "data" estimating the quality of aquatic discharges from construction.

{¶ 63} But the preconstruction rule requires water samples to be collected "only in bodies of water likely to be affected by the proposed facility." Ohio Adm.Code 4906-4-07(C)(1)(b). Alamo and Angelina averred that water-quality monitoring for preconstruction surveys was not necessary, because the projects will not create any water-related discharges or wastewater and there will be no streams receiving runoff.

{¶ 64} Similarly, the rule dealing with water quality during construction requires only an "estimate" of the "quality * * * of aquatic discharges from the site clearing and construction operations." Ohio Adm.Code 4906-4-07(C)(2)(b). Alamo and Angelina have provided such an estimate. They averred that construction "will not cause any aquatic discharges" and "will involve only limited activities requiring the management of storm-water related pollutants" and that no effluents are expected to be discharged into bodies of water or receiving streams during site clearing and construction.

### 2. Mitigation measures

{¶ 65} The citizens maintain that Alamo and Angelina failed to comply with Ohio Adm.Code 4906-4-07(C)(2)(c), which requires an applicant to

"[d]escribe any plans to mitigate the above effects"—referring to the estimated aquatic discharges from site clearing and construction under subsection (C)(2)(d)— "in accordance with current federal and Ohio regulations." The citizens also assert a violation of Ohio Adm.Code 4906-4-07(C)(2)(e), which requires an applicant to "[d]escribe the equipment proposed for control of effluents discharged into bodies of water and receiving streams."

{¶ 66} The citizens concede that the solar farms' applications generally describe equipment and measures that would be employed to protect surface waters from soil erosion and sedimentation. The citizens also acknowledge that both applicants further agreed to mitigate any contamination of surface waters caused by the projects through specific conditions in their amended stipulations. The citizens accuse the board of having "overlooked" data requirements in its own rules, and they fault it for simply accepting that these mitigation measures will be implemented when Alamo and Angelina apply for stormwater permits under the conditions set forth in the amended stipulations.

{¶ 67} But again, R.C. 4906.10(A) empowers the board to grant a siting certificate "upon such terms, conditions, or modifications of the construction, operation, or maintenance" of the facility as the board deems appropriate. The conditions are binding on Alamo and Angelina and are subject to monitoring for compliance by board staff. *See Buckeye Wind*, 131 Ohio St.3d 449, 2012-Ohio-878, 966 N.E.2d 869, at ¶ 17 and ¶ 32 (plurality opinion).

{¶ 68} Accordingly, we reject the citizens' fifth proposition of law.

## G. Proposition of Law No. 6: Setbacks

{¶ 69} In their final proposition of law, the citizens argue that the board violated the requirement that it determine that the facilities represent the minimum adverse environmental impact by accepting unreasonably narrow setbacks between the solar farms and neighboring land and homes.

**{¶ 70}** We have already rejected the citizens' argument that the setbacks were insufficient for visual screening as part of our discussion addressing the second proposition of law. The citizens also argue that the setbacks approved by the board fall short of protecting neighbors from inverter noise. But whether setbacks are sufficient to protect the public from adverse environmental impacts is an evidentiary issue. *Champaign Wind*, 146 Ohio St.3d 489, 2016-Ohio-1513, 58 N.E.3d 1142, at ¶ 30. The citizens failed to present any evidence that the setbacks approved in these cases are insufficient to mitigate noise impacts. Therefore, they have not met their burden to demonstrate that the board acted unreasonably in its determination under R.C. 4906.10(A)(3) that the proposed facilities represent the minimum adverse environmental impact. We reject the citizens' sixth proposition of law.

### III. CONCLUSION

**{¶ 71}** The citizens have failed to establish that the board acted unlawfully by not complying with its own regulations. And they have failed to establish that the board acted unreasonably in making the determinations required by R.C. 4906.10(A). Therefore, we affirm the board's orders granting the certificates.

Orders affirmed.

FISCHER, DONNELLY, and DETERS, JJ., concur.

KENNEDY, C.J., concurs in judgment only.

BRUNNER, J., concurs in part and concurs in the judgment, with an opinion joined by STEWART, J.

_____

**BRUNNER, J., concurring in part and concurring in judgment.**

**{¶ 72}** I concur in the judgment of the court, and I concur in the analysis set forth in part II, sections A through G of the majority opinion. I write separately because the majority opinion improperly and unnecessarily discusses our holding in *TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers &*

*Surveyors*, ___ Ohio St.3d ___, 2022-Ohio-4677, ___ N.E.3d ___, regarding the activities of appellee, the Ohio Power Siting Board, when that case is not relevant or applicable to reviewing the issues raised by the parties. Appellants, Concerned Citizens of Preble County, L.L.C., and certain individual members of that group (collectively, "the citizens"), challenge whether appellee, the board, had before it the right kind or amount of evidence necessary to make the required determinations before granting the applications of intervening appellees, Alamo Solar I and Angelina Solar I (collectively, "the solar-energy companies"). These are issues of fact.[5]

{¶ 73} Therefore, our task is straightforward: we must determine whether the board's decisions were manifestly against the weight of the evidence and were so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty, *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The majority performs this task and affirms the orders of the board.

{¶ 74} This is quite different from what we were tasked with in *TWISM*, which was to determine what the terms in a statute mean. *TWISM* at ¶ 1-2. In *TWISM*, a majority of this court decided to revisit our approach to agency deference. *Id.* at ¶ 20. The majority opinion in that case concluded that when the meaning of a law is in dispute, it is the task of the judiciary, not an administrative agency, to ultimately determine what the law means. *Id.* at ¶ 3. Therefore, a court may consider but need not defer to an agency's interpretation of a statute that the agency is charged by law with administering. *Id.* First, I do not argue with the principle of law announced in *TWISM*. But the danger of mentioning it in this

_____

5. The majority attempts to reframe the citizens' arguments as asserting that the board "misinterpreted" its regulations. Majority opinion, ¶ 9, 25, 39, 47, 54. However, the terms "misinterpret," "misinterpreted," or "misinterpretation" do not appear anywhere in the citizens' merit or reply briefs.

context is that the next step will be that it has application in this context when, here, it simply does not apply. Nor do the facts or assertions of the parties support its use.

{¶ 75} The majority opinion hypothesizes the existence of claims by the board and the solar-energy companies that this court "should defer to the board's interpretation of the statutory scheme." Majority opinion at ¶ 12. But this "statutory scheme" deference is not argued by the parties in their briefs. And no party in this case has requested that this court afford deference to the board in its interpretation of any law or regulation.[6]

{¶ 76} The board did ask this court for deference in its determination of the *facts*. And the solar-energy companies argued that the board's decisions, which involved assessing the *weight and credibility of the evidence*, "should be afforded deference." Giving deference to the board in its factual determination of the evidence is consistent with established caselaw. *In re Application of Duke Energy Ohio, Inc.*, 166 Ohio St.3d 438, 2021-Ohio-3301, 187 N.E.3d 472, ¶ 39 ("[The Ohio Power Siting B]oard's evaluation of the evidence merits deference, and we will not disturb it"), citing *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 76 Ohio St.3d 163, 165, 666 N.E.2d 1372 (1996).

{¶ 77} Moreover, the majority opinion does not actually interpret any statute or regulation as part of its review. Thus, there is no need to explain, let alone extend, the holding in *TWISM*, ___ Ohio St.3d ___, 2022-Ohio-4677, ___ N.E.3d ___, when there is no call for its application. In fact, in applying R.C. 4906.10(A)(2) and (3)[7] in this case, the majority explicitly finds that *we must defer*

---

6. The parties did reference cases in their briefs that support the idea that courts should give deference to an agency's interpretation of a *statute*, but we have since clarified our position on that issue through our decision in *TWISM*, ___ Ohio St.3d ___, 2022-Ohio-4677, ___ N.E.3d ___. Furthermore, referencing those cases does not bring the issue of agency deference involving *regulations* or *administrative rules* squarely before us.
7. R.C. 4906.10(A) provides:

to the board's determinations of the probable environmental impacts. Majority opinion at ¶ 15 ("The statute dictates that the board must make these determinations, not this court"). Thus, the majority's discussion of *TWISM* here is inapposite. No party asks us to employ or denounce agency-interpretation deference regarding a statute or regulation. Because the discussion related to *TWISM* in the majority opinion does not apply to the facts and legal arguments made here, it does not create legal precedent.

**{¶ 78}** Further, to the extent that the majority opinion insinuates that the holding in *TWISM*—that a court may consider but need not defer to an agency's interpretation of a statute—applies equally to an agency's interpretation of its own regulations, *see* majority opinion at ¶ 13, it is wrong. State agencies promulgate administrative rules when they are empowered by statute to do so. Here, the board is empowered by R.C. 4906.03(C) to promulgate "rules establishing criteria for evaluating the effects on environmental values of proposed and alternative sites." It is the board that would know what it intended to say in its own regulations, and it is the board that would know how it intended the regulations to be applied. *See* R.C. 119.01(A)(1) (" 'Agency' means, except as limited by this division, any official, board, or commission having authority to promulgate rules"); R.C. 119.01(C) (" 'Rule' means any rule, regulation, or standard, having a general and uniform operation, adopted, promulgated, and enforced by any agency under the authority of the laws governing such agency"); R.C. 119.02 ("Every agency authorized by law to adopt, amend, or rescind rules shall comply with the procedure

---

The board shall not grant a certificate for the construction, operation, and maintenance of a major utility facility, either as proposed or as modified by the board, unless it finds and determines all of the following:

* * *

(2) The nature of the probable environmental impact;

(3) That the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations.

prescribed in sections 119.01 to 119.13, inclusive, of the Revised Code"); R.C. 119.03(G)(3) ("*The general assembly*, by adopting a concurrent resolution, and in accordance with section 107.43 of the Revised Code, may do either of the following: (a) Invalidate, in whole or in part, an emergency rule adopted or amended by an agency in response to a state of emergency, as defined under section 107.42 of the Revised Code, under division (G)(1) of [R.C. 119.03]; (b) Authorize an agency to readopt, in whole or in part, a rule that was rescinded in response to a state of emergency under division (G)(1) of [R.C. 119.03]" [emphasis added]).

{¶ 79} Importantly, the parties here did not present the agency-deference issue addressed in *TWISM* to this court. Nor has that issue been briefed or argued; it plays no part in our resolution of this case, and the majority's discussion of *TWISM* is a distraction that is beyond the scope of what we were tasked with deciding.

{¶ 80} For these reasons, I respectfully concur in part and concur in the judgment.

STEWART, J., concurs in the foregoing opinion.

————————————

Van Kley & Walker, L.L.C., and Jack A. Van Kley, for appellants.

Dave Yost, Attorney General, and Werner L. Margard III, John H. Jones, Robert A. Eubanks (in 2022-0053 only), and Shaun P. Lyons (in 2022-0054 only), Assistant Attorneys General, for appellee.

Vorys, Sater, Seymour & Pease, L.L.P., Michael J. Settineri, and Emily J. Taft, for intervening appellees Alamo Solar I, L.L.C. and Angelina Solar I, L.L.C.

————————————