[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Harvey Solar I, L.L.C.*, Slip Opinion No. 2025-Ohio-1503.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-1503

IN RE APPLICATION OF HARVEY SOLAR I, L.L.C., FOR A CERTIFICATE OF ENVIRONMENTAL COMPATIBILITY AND PUBLIC NEED TO CONSTRUCT A SOLAR-POWERED ELECTRIC-GENERATION FACILITY IN LICKING COUNTY, OHIO; SAVE HARTFORD TWP., L.L.C., ET AL., APPELLANTS; POWER SITING BOARD, APPELLEE; HARVEY SOLAR I, L.L.C., INTERVENING APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Harvey Solar I, L.L.C.*, Slip Opinion No. 2025-Ohio-1503.]

*Power Siting Board—R.C. 4906.10(A)—Solar-powered electric-generation facilities—Applications for certificates of environmental compatibility and public need—Board did not act unreasonably in making the determinations required by R.C. 4906.10(A)—Power Siting Board's order granting certificate affirmed.*

(No. 2023-0793—Submitted January 7, 2025—Decided April 30, 2025.)

APPEAL from the Power Siting Board, No. 21-164-EL-BGN.

————————————

DEWINE, J., authored the opinion of the court, which FISCHER, BRUNNER, DETERS, HAWKINS, and SHANAHAN, JJ., joined. KENNEDY, C.J., concurred in judgment only, with an opinion.

**DEWINE, J.**

**{¶ 1}** The Ohio Power Siting Board authorized Harvey Solar I, L.L.C., to build a solar farm in Licking County. Save Hartford Twp., L.L.C., a citizens group, and 11 nearby residents[1] appeal the board's order to this court. (This opinion will refer to all appellants as "the residents.")

**{¶ 2}** Large-scale commercial solar farms have proved controversial in this State. Some tout their benefits in reducing dependence on fossil fuels and creating new jobs and development. Others argue that solar farms constitute an eyesore for affected communities, unnecessarily remove farmland from productive agricultural usages, and are costly and inefficient producers of energy. These competing viewpoints undergird this case. The residents assert that "the project's masses of unsightly towering solar panels and substation will convert the community's scenic country landscape into industrial blight" and that "[t]he solar project will remove 2,610 acres from food production." Harvey Solar touts the benefits of its project in meeting Ohio's "growing need for power generation," creating construction jobs, and providing additional tax revenues for local communities.

**{¶ 3}** Overarching public-policy questions about the general societal value of commercial solar farms are the province of the General Assembly, not this court. *See State v. Parker*, 2019-Ohio-3848, ¶ 37 ("It is the role of the legislature to weigh . . . competing policy concerns and make the public policy of this state. . . ."). The General Assembly has authorized commercial solar farms in Ohio. *See* R.C. Ch.

---

1. The nearby residents are Janeen Baldridge, Edward Bauman, Mary Bauman, Julie Bernard, Richard Bernard, Anthony Caito, John Johnson, Daniel Adam Lanthorn, Nancy Martin, Paul Martin, and Gary O'Neil.

4906. It has conditioned the construction of such facilities on approval of the Power Siting Board and provided the board with statutory guidelines that it must follow in making its determination about whether to approve a solar farm. *See* R.C. 4906.10.

{¶ 4} Our task is to determine whether the Power Siting Board complied with the statutory criteria when it authorized construction of Harvey Solar's solar farm. Under the standard for our review prescribed by the General Assembly, we may reverse the board's order approving the solar farm if the residents establish that the order was unlawful or unreasonable. *See* R.C. 4903.13; R.C. 4906.12. Because we conclude that they have not done so, we affirm the board's order.

**I. The Power Siting Board Approves the Harvey Solar Project**

{¶ 5} Before construction begins on a facility that will generate at least 50 megawatts of power, the Power Siting Board must issue a "certificate of environmental compatibility and public need," R.C. 4906.01. R.C. 4906.04. In August 2021, Harvey Solar applied to build a solar farm in Hartford and Bennington Townships in Licking County that would generate up to 350 megawatts.

{¶ 6} Multiple parties intervened in the matter, including the Village of Hartford, the Ohio Farm Bureau Federation, the Licking County Engineer, the Licking County Soil and Water Conservation District, the Hartford Township Board of Trustees, the Bennington Township Board of Trustees, and the residents.

{¶ 7} The board staff investigated the potential impact of the project and submitted a report. Subsequently, Harvey Solar, the board staff, and most of the other intervening parties—except the residents—entered into a stipulation

recommending that the board issue a construction certificate subject to 39 conditions.[2]

{¶ 8} The board held an evidentiary hearing and ultimately issued a decision and order amending and approving the stipulation and granting a certificate of construction for Harvey Solar's facility.  The facility will consist of rows of large solar panels mounted on metal racks, inverters and transformers, above- and below-ground collection cables, a substation, a network of access roads, and an operations and maintenance building.  It will be constructed within a 2,630-acre area of land that Harvey Solar leases from private landowners.

{¶ 9} After unsuccessfully seeking rehearing before the board, the residents appealed to this court.  Harvey Solar intervened, *see* 2023-Ohio-2766, urging us to affirm the board's order.

## II.  The Residents Have Not Demonstrated that the Board's Order Was Unreasonable or Unlawful

{¶ 10} The General Assembly has set standards for the construction of major utility facilities in Ohio and delegated to the Power Siting Board the authority to implement those standards.  Before the board may approve construction of a new major utility facility, it must make eight substantive determinations, which are set forth in R.C. 4906.10(A).  Four of them are at issue in this appeal.  The residents contend that the board failed to meet its obligations to find and determine the following under R.C. 4906.10(A):

> (2) The nature of the probable environmental impact;

---

2. The Village of Hartford signed the stipulation but took no position on whether a certificate should be issued and instead requested that the conditions be included in any certificate that was issued. The Hartford Township Board of Trustees later modified its position to take no position on the stipulation.

(3) That the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations;

. . .

(5) That the facility will comply with [the water pollution requirements of] Chapter[] . . . 6111. of the Revised Code . . . ; [and]

(6) That the facility will serve the public interest, convenience, and necessity[.]

**{¶ 11}** The General Assembly also has established the standard of review that we are to apply in reviewing the board's determinations. We may only reverse, modify, or vacate a board order when, after considering the record, we conclude that the order "was unlawful or unreasonable." R.C. 4903.13. Challengers to a board order bear the burden of establishing that the order is unlawful or unreasonable. *In re Application of Alamo Solar I, L.L.C.*, 2023-Ohio-3778, ¶ 10.

**{¶ 12}** "Unlawful" here refers to our review of legal questions, such as the proper interpretation of a statute or whether the board followed its own administrative rules. *Id.* at ¶ 11; *In re Application of Firelands Wind, L.L.C.*, 2023-Ohio-2555, ¶ 12. Our review of questions of law is de novo. *Alamo Solar* at ¶ 11.

**{¶ 13}** The "unreasonable" part of the standard of review is relevant when we examine the board's determinations under R.C. 4906.10(A), which requires the board to determine a project's compliance with broad statutory criteria. *See Firelands Wind* at ¶ 14-15. The statute gives the board—not this court—the authority to make these determinations, and the "open-textured nature of the terms at issue inherently vests a degree of discretion in the administrative agency," *id.* at ¶ 15. We review whether the board's exercise of its statutory authority was reasonable. *Alamo Solar* at ¶ 16.

{¶ 14} For example, we examine the reasonableness of the board's decisions about whether a facility represents the "minimum adverse environmental impact," R.C. 4906.10(A)(3), or whether it will serve the "public interest, convenience, and necessity," R.C. 4906.10(A)(6), by determining whether the board's decision is within the bounds of those statutory directives. *Alamo Solar*, 2023-Ohio-3778, at ¶ 16. In other words, we look at what the statute requires the board to do and determine whether the determinations that the board made in complying with the statute were reasonable. We may find a board decision unreasonable when the evidence clearly isn't enough to support the decision or when the decision is internally inconsistent. *Id.*; *Firelands Wind* at ¶ 16.

{¶ 15} In reviewing the board's determinations, we do "not . . . reweigh the evidence or second-guess [the board] on questions of fact." *Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 2017-Ohio-7566, ¶ 35. "We will not disturb the board's factual determinations 'when the record contains sufficient probative evidence to show that the board's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty.' " *Firelands Wind*, 2023-Ohio-2555, at ¶ 17, quoting *In re Application of Champaign Wind, L.L.C.*, 2016-Ohio-1513, ¶ 7.

{¶ 16} A consistent theme in the residents' seven propositions of law is their belief that the board misapplied its own rules by not requiring Harvey Solar to submit all the information required by those rules. They contend that, as a result, the board did not have the information necessary to make the determinations required by R.C. 4906.10(A)(2), (3), (5), and (6).

{¶ 17} Applying the standards noted above, we conclude that the residents' arguments lack merit. In some instances, the applicable statutes and rules did not require Harvey Solar to provide the information that the residents contend must be

provided. In other instances, Harvey Solar submitted the information that the residents claim was missing. We address each proposition in turn.

### A. Adverse Visual Impacts

{¶ 18} In their first proposition of law, the residents assert that the board acted unlawfully and unreasonably by issuing the certificate without requiring Harvey Solar to block the neighbors' views of the project, and therefore the board violated its duty under R.C. 4906.10(A)(3) to determine that the facility represents the minimum adverse environmental impact. The residents also argue that Harvey Solar failed to comply with former Adm.Code 4906-4-08(D)(4)(f),[3] which required an applicant to "[d]escribe measures that will be taken to minimize any adverse visual impacts created by the facility, including . . . visual screening," *see* 2017-2018 Ohio Monthly Record 2-3002 (effective Apr. 26, 2018).

{¶ 19} Harvey Solar's application included a preliminary landscape plan. The plan used vegetative screening—such as shade trees, shrubs, and native grasses—to partially screen the facility from its neighbors. As a condition of the certificate, the board ordered Harvey Solar to work with a licensed landscape architect to prepare a final landscape plan before beginning construction. Among other things, the final plan must improve the view from any adjacent home with a direct line of sight to the facility. Harvey Solar is required to maintain the vegetative screening for the life of the solar farm and replace any failed plantings so that after five years at least 90 percent of the vegetation has survived. The board staff must review and approve the final landscape plan.

{¶ 20} The residents contend that the preliminary landscape plan was flawed and that it did not do enough to minimize the facility's negative visual impacts. For example, citing the testimony of their own landscaping witness, the

---

3. After Harvey Solar filed its application, the board amended its regulations, *see* 2023-2024 Ohio Monthly Record 2-2946-2-2994 (effective May 30, 2024). The regulations that were in effect when Harvey Solar filed its application apply here.

residents argue that the trees and shrubs will be too small when planted to adequately shield the neighbors' views and that deer and rabbits will eat much of the young vegetation. They contend that because the board did not require Harvey Solar to plant vegetation around the facility "in a manner that completely blocks neighboring views" of the solar panels within a reasonable period of time, the project violates R.C. 4906.10(A)(3) and former Adm.Code 4906-4-08(D)(4)(f).

{¶ 21} The board's obligation under R.C. 4906.10(A)(3) was to determine that the facility "represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent conditions." The statute "does not require the elimination of all adverse impacts." *Alamo Solar*, 2023-Ohio-3778, at ¶ 43; *see also Fireland Wind*, 2023-Ohio-2555, at ¶ 27 (R.C. 4906.10(A)(3) "does not require the board to conclude that the facility will have no adverse environmental impact—only that the adverse environmental impact is minimal in light of the constraints"). Similarly, former Adm.Code 4906-4-08(D)(4)(f) required only that Harvey Solar "*[d]escribe* measures that will be taken to *minimize* any adverse visual impacts created by the facility, including . . . visual screening" (emphasis added), 2017-2018 Ohio Monthly Record at 2-3002. Neither the statute nor the rule required Harvey Solar to "completely screen" all views of the facility from neighboring properties, *Alamo Solar* at ¶ 43.

{¶ 22} Additionally, the board heard testimony from both the residents' landscaping witness and Harvey Solar's landscape architect. After weighing that testimony, the board was "unpersuaded" by the residents' evidence and concluded that the preliminary landscape plan combined with the requirement to file a final plan before construction represented the minimum adverse environmental impacts. "Our function on appeal is not to reweigh the evidence or second-guess the [board] on questions of fact." *Lycourt-Donovan*, 2017-Ohio-7566, at ¶ 35. Because there is sufficient probative evidence in the record to support the board's decision, we

conclude that the residents have not carried their burden to justify reversal of that finding.

{¶ 23} The residents next contend that former Adm.Code 4906-4-08(D)(4)(f) required Harvey Solar to submit a *binding* landscape plan before certification and that without a final plan in the record, the board could not make the determination required by R.C. 4906.10(A)(3). But by its terms, former Adm.Code 4906-4-08(D)(4)(f) only required Harvey Solar to describe the visual impact of the facility; it did not require "the applicant to include a landscape plan with the application, let alone a binding one," *Alamo Solar*, 2023-Ohio-3778, at ¶ 38. Further, the residents overlook that the board essentially converted Harvey Solar's preliminary landscape plan into an enforceable one. In the board's rehearing entry, it noted that the stipulation obligated Harvey Solar to construct the facility "as described in the application" and that failing to do so would be a violation of the terms of the stipulation. Therefore, the board concluded that the preliminary landscape plan was the minimum that Harvey Solar must do and that the final plan could only strengthen the preliminary plan.

{¶ 24} It is well-settled that the board is not required to resolve every issue before issuing a certificate. R.C. 4906.10(A) empowers the board to grant a siting certificate "upon such terms, conditions, or modifications of the construction, operation, or maintenance" of a proposed facility as the board deems appropriate. And we have recognized the "board's authority to impose conditions that are subject to monitoring for compliance by board staff." *Alamo Solar* at ¶ 41; *see also Firelands Wind*, 2023-Ohio-2555, at ¶ 46, 65; *In re Application of Icebreaker Windpower, Inc.*, 2022-Ohio-2742, ¶ 39; *In re Application of Buckeye Wind, L.L.C.*, 2012-Ohio-878, ¶ 16-18 (lead opinion).

{¶ 25} Here, Harvey Solar must construct its facility in accordance with the conditions established by the board. So even though the board's order allows Harvey Solar to flesh out details in the final version of the landscape plan as the

construction process evolves, the board did not act unlawfully in issuing the certificate subject to conditions. *See Alamo Solar* at ¶ 41.

{¶ 26} Based on the foregoing, we reject the residents' first proposition of law.

### B. Flooding

{¶ 27} In their second proposition of law, the residents contend that flooding is pervasive in the project area and that Harvey Solar intends to build solar panels within a 100-year floodplain. They claim that Harvey Solar provided no plans to mitigate the consequences of flooding and that the board therefore violated its duty to determine that the facility represents the minimum adverse environmental impact under R.C. 4906.10(A)(3) and former Adm.Code 4906-4-08(A)(4)(e).

{¶ 28} Former Adm.Code 4906-4-08(A)(4)(e) required an applicant to provide "an analysis of the prospects of floods for the area, including the probability of occurrences and likely consequences of various flood stages, and describe plans to mitigate any likely adverse consequences." 2017-2018 Ohio Monthly Record at 2-2999. During the board proceedings, Harvey Solar presented evidence that the probability of flooding in the project area was "very low" and that there were "virtually no 100-year floodplains in the Project Area" because only 41.5 acres of the 2,600-acre project area were included in a floodplain. Harvey Solar agreed that if it built any portion of the facility in the floodplain, it would follow all substantive floodplain requirements and regulations. As a condition of the certificate, the board ordered Harvey Solar to coordinate any construction in the floodplain with the local floodplain administrator and to file all documents permitting such construction on the case docket.

{¶ 29} Contrary to the residents' contention, Harvey Solar provided what Adm.Code 4906-4-08(A)(4)(e) required: "an analysis of the prospects of floods for the area" and a description of the "plans to mitigate any likely adverse

consequences." The certificate also included mitigation measures: Harvey Solar must coordinate any construction within the floodplain with the county floodplain administrator.

{¶ 30} The residents contend that the board improperly abdicated its duties under R.C. 4906.10(A)(3) and former Adm.Code 4906-4-08(A)(4)(e) by deferring floodplain issues to a county employee. But "the board is not required to resolve all issues relating to a facility's potential environmental impact before issuing a certificate," and it is "reasonable for the board to rely on the agency with . . . the appropriate experience, expertise, and procedures in place." *Firelands Wind*, 2023-Ohio-2555, at ¶ 65. For example, we held in *Firelands Wind* that the board did not abdicate its duties under R.C. 4906.10(A) by directing a wind-farm applicant to work with the United States Fish and Wildlife Service after certification to protect the local bald-eagle population. Here, it was reasonable for the board to require Harvey Solar to coordinate with the Licking County floodplain administrator—an appropriate official with expertise in floodplain issues.

{¶ 31} Regarding potential flooding outside the floodplain, although the residents submitted testimony and photographs indicating that farmland and public roads in the project area sometimes flood, they failed to cite credible evidence indicating that construction or operation of the facility will exacerbate that flooding. Instead, the residents simply assume that the project will increase the potential for flooding. But Harvey Solar submitted evidence that postconstruction runoff should be *less* than preconstruction runoff, which means that after the project is completed, drainage in the project area should be improved. The board cannot be faulted for failing to mitigate the adverse consequences of potential flooding when there is no evidence that the project will cause additional flooding.

{¶ 32} We therefore reject the residents' second proposition of law.

### *C. Wildlife*

{¶ 33} In their third proposition of law, the residents assert that the board acted unlawfully and unreasonably by approving the solar facility without receiving sufficient information about the project's probable impact on wildlife, despite its duty to do so under R.C. 4906.10(A)(2) and (3).  The residents' argument centers on former Adm.Code 4906-4-08(B)(1), which required an applicant to:

> (c) Provide the results of a literature survey of the plant and animal life within at least one-fourth mile of the project area boundary. . . .
> (d) Conduct and provide the results of field surveys of the plant and animal species identified in the literature survey.

2017-2018 Ohio Monthly Record at 2-3000.

{¶ 34} The residents contend that Harvey Solar did not conduct field surveys and that its ecological witness admitted as much on cross-examination.  But Harvey Solar's witness did not make such an admission.  Rather, the witness testified only that no "species-specific surveys" were conducted.  Although the residents have not explained precisely what a species-specific field survey would entail, they seem to be arguing that because Harvey Solar did not identify and study every animal species likely to be found in the project area, it did not conduct the type of field surveys required by the administrative rule.  But we have previously explained that "nothing in Ohio Adm.Code 4906-4-08(B)(1)(d) prescribes a specific methodology for how field surveys are to be conducted."  *Alamo Solar*, 2023-Ohio-3778, at ¶ 51.

{¶ 35} Moreover, the record here shows that Harvey Solar did in fact conduct field surveys for animal life.  With its application, Harvey Solar submitted a "Wildlife and Habitat Assessment Report" prepared by Cardno, an environmental

12

consulting firm. The report indicated that in fall 2019, Cardno reviewed various resources to identify potential wildlife in the project area. Cardno then conducted "field survey verification" in November 2019, November 2020, and April 2021, with each site visit lasting between one and four days. Cardno also conducted a separate ecological-impact assessment, which included field surveys.

{¶ 36} The results of the field surveys were detailed in both reports. For example, the wildlife report explained that "[d]uring field surveys Cardno staff observed minimal wildlife within the Study Area," that "[n]o federal or state listed bird species . . . was observed during the field efforts conducted by Cardno," that "Cardno observed no evidence of bald eagle or raptor nests or activity during the field surveys," and that "Cardno observed no evidence of bat activity during the field surveys." The report also included a chart of state-listed species and whether they were observed during the field surveys. The ecological-impact report noted that the "habitats surveyed during field efforts appear to lack significant or obvious evidence of [rare, threatened, or endangered] species" and that "[d]uring the field surveys, Cardno observed no individuals or populations of freshwater mussel species."

{¶ 37} Cardno ultimately concluded that because the solar-project land had been regularly disturbed by seasonal farming, the project is not likely to have significant or adverse impacts to wildlife or sensitive species. Nothing in the record suggests that Cardno's methods were unreasonable or its work inadequate.

{¶ 38} The residents have not shown that Harvey Solar failed to comply with former Adm.Code 4906-4-08(B)(1)(d). Nor have they demonstrated that the board lacked sufficient evidence about wildlife to make the determinations required under R.C. 4906.10(A)(2) and (3).

{¶ 39} Accordingly, we reject the third proposition of law.

### D. Noise

{¶ 40} In their fourth proposition of law, the residents argue that the board did not receive enough information about nighttime noise from the facility, in violation of its duties under R.C. 4906.10(A)(2) (nature of probable environmental impact) and (A)(3) (that the facility represents the minimum adverse environmental impact). The residents claim that former Adm.Code 4906-4-08(A)(3)(b) and (c) required Harvey Solar to submit modeling data predicting the facility's nighttime noise levels, and that without that data, the board could not determine the nature of the probable environmental impact and whether the facility represents the minimum adverse environmental impact.

{¶ 41} The problem with the residents' argument is that former Adm.Code 4906-4-08(A)(3)(b) did not require a *solar-farm* applicant to conduct noise modeling under either day or nighttime conditions. *See Alamo Solar*, 2023-Ohio-3778, at ¶ 25-26. The rule required that a *wind-farm* applicant use computer-modeling software or similar wind-turbine noise methodology to describe the operational noise at the project-area boundary. But there was no similar requirement for a solar-farm applicant.

{¶ 42} For solar farms, former Adm.Code 4906-4-08(A)(3)(b) directed an applicant to "*[d]escribe* the operational noise levels expected at the nearest property boundary." (Emphasis added.) 2017-2018 Ohio Monthly Record at 2-2999. And former Adm.Code 4906-4-08(A)(3)(c) explained that the description should "*[i]ndicate* . . . the operational noise level at each habitable residence, school, church, and other noise-sensitive receptors, under both day and nighttime operations." (Emphasis added.) *Id.*

{¶ 43} Harvey Solar's application described its facility as producing "essentially no sound at night" except for modest sound from the continued energization of the transformer at the substation. Because the facility will not generate any energy at night, Harvey Solar only conducted noise modeling during

daytime. Harvey Solar reported the results of that modeling in a "Sound Level Assessment Report." That report also indicated that "[a]t night (i.e., when the sun is not shining) the photovoltaic inverters will not contribute any operational sound" and that any nighttime sound from the substation will be "highly localized to the immediate surrounding area of the proposed substation." During the evidentiary hearing, both Harvey Solar's project manager and the primary author of the sound report testified that the inverters will not produce electricity at night but that they might make slight sounds as they provide ancillary services to the grid.

{¶ 44} On appeal, the residents essentially argue that the board should have required Harvey Solar to conduct nighttime noise modeling based on the possibility that nighttime inverter noise could disturb neighbors. But the residents did not introduce any evidence to counter Harvey Solar's position that the facility will not produce any appreciable operational nighttime noise. "We will not reverse a commission order based on speculation." *In re Application of Ohio Power Co.*, 2018-Ohio-4698, ¶ 50.

{¶ 45} Because Harvey Solar described the expected operational nighttime noise level, it complied with the administrative rule. The board did not act unlawfully by not requiring nighttime noise modeling. And we find nothing unreasonable in the board's determination about the facility's expected environmental impact relating to nighttime noise.

{¶ 46} Thus, we reject the residents' fourth proposition of law.

### E. Water Quality

{¶ 47} In their fifth proposition of law, the residents claim that the board acted unlawfully and unreasonably by granting the certificate without information about the facility's impact on local stream-water quality, in violation of its duty under R.C. 4906.10(A)(2) (nature of probable environmental impact), (3) (that the facility represents the minimum adverse environmental impact), and (5) (that the facility complies with applicable statutes and rules). Specifically, the residents

15

contend that Harvey Solar failed to comply with former Adm.Code 4906-4-07(C), which required an applicant to provide data about surface water flowing from the project area and describe any plans to mitigate any contaminants discharged into surface waters.

### 1. Pollution impacts

{¶ 48} Three subsections of former Adm.Code 4906-4-07(C) dealt with water quality. Subsection (C)(1)(d) related to water quality before construction, and subsections (C)(2)(b) and (C)(2)(d) related to water quality during construction.

{¶ 49} The residents contend that Harvey Solar violated this rule by failing to supply one-year sample-monitoring data. Former Adm.Code 4906-4-07(C)(1)(d) required an applicant to "[d]escribe the existing water quality of the receiving stream based on at least one year of monitoring data, using appropriate Ohio environmental protection agency reporting requirements." Ohio Monthly Record 2015-2016, 2-1886 (effective Dec. 11, 2015). This rule, however, required that water samples be collected "only in bodies of water likely to be affected by the proposed facility." Ohio Monthly Record 2015-2016 at 2-1887. Harvey Solar's application indicated that sample-monitoring data was not required because its project will not generate any water-related discharges or wastewater. The residents did not submit any evidence to prove otherwise. Therefore, because there is no evidence that the project will affect any stream or other body of water, Harvey Solar was not required to provide one-year sample-monitoring data from a "receiving stream." *See Alamo Solar*, 2023-Ohio-3778, at ¶ 61-63 (rejecting a similar argument by the appellants in a solar-farm case).

{¶ 50} As for the during-construction rules, former Adm.Code 4906-4-07(C)(2)(b) required an applicant to "[p]rovide an estimate of the quality and quantity of aquatic discharges from the site clearing and construction operations," and subsection (C)(2)(d) required an applicant to "[d]escribe any changes in flow

patterns and erosion due to site clearing and grading operations." Ohio Monthly Record 2015-2016 at 2-1887. The residents contend that Harvey Solar failed to provide the data required by these rules.

{¶ 51} But former Adm.Code 4906-4-07(C)(2)(b) required only an "estimate" of the "quality and quantity of aquatic discharges from" construction operations. Even though Harvey Solar maintained that this provision was inapplicable to its project, its application stated that the project will not create any "identifiable water-related discharges" and that construction will involve "only limited activities requiring the management of stormwater related pollutants." Thus, Harvey Solar provided the "estimate" required by subsection (C)(2)(b). *See Alamo Solar* at ¶ 64 (reaching a similar conclusion). Harvey Solar's application expressly included the description required by this provision by stating that "no significant changes in flow patterns and erosion are anticipated because the land where construction is planned is relatively level and only limited grading will be needed." Harvey Solar provided what the rules required.

*2. Mitigation measures*

{¶ 52} The residents also argue that Harvey Solar failed to comply with former Adm.Code 4906-4-07(C)(2)(c), which required an applicant to "[d]escribe any plans to mitigate the above effects"—referring to the estimated aquatic discharges from site clearing and construction under subsection (C)(2)(b)—"in accordance with current federal and Ohio regulations," 2015-2016 Ohio Monthly Report at 2-1887. They further contend that Harvey Solar violated former Adm.Code 4906-4-07(C)(2)(e), which required an applicant to "[d]escribe the equipment proposed for control of effluents discharged into bodies of water and receiving streams."

{¶ 53} Regarding subsection (C)(2)(c), as stated above, Harvey Solar indicated that construction will involve only limited activities requiring the management of stormwater-related pollutants. To mitigate those effects, the

stipulation—and subsequently, the certificate—require Harvey Solar to construct the facility in a manner that incorporates stormwater management under the Ohio EPA National Pollutant Discharge Elimination System Construction General Permit ("Ohio EPA permit") and in accordance with the Ohio EPA's guidance on postconstruction-storm-water controls for solar-panel arrays and Licking County's soil erosion and stormwater regulations. According to testimony presented by Harvey Solar in support of its application, to comply with the Ohio EPA permit, Harvey Solar must, among other things, prepare and implement a storm-water-pollution-prevention plan, implement best management practices to reduce and control erosion and sedimentation during construction, and provide for postconstruction stormwater management of the project. Harvey Solar will also be subject to regular inspections.

{¶ 54} The residents maintain that the board abdicated its duties to examine water-quality issues by allowing Harvey Solar to obtain permits from other agencies. But again, the board may impose conditions subject to further monitoring and may rely on other agencies with the requisite enforcement authority and appropriate procedures in place. *See, e.g.*, *Alamo Solar*, 2023-Ohio-3778, at ¶ 66; *Icebreaker Windpower*, 2022-Ohio-2742, ¶ 39-40; *Firelands Wind*, 2023-Ohio-2555, at ¶ 65. Therefore, Harvey Solar sufficiently described its plans to mitigate the effects of any stormwater-related pollution.

{¶ 55} Regarding subsection (C)(2)(e)'s requirement that the applicant describe "the equipment proposed for control of effluents discharged into bodies of water and receiving streams," 2015-2016 Ohio Monthly Record at 2-1887, Harvey Solar's application stated that because the project will not create any identifiable water-related discharges, "it will include no water pollution control equipment or wastewater treatment processes." Because there is no evidence that the project will cause effluents to be discharged into any bodies of water or streams—other than potential changes to stormwater runoff, which will be covered by the EPA permit—

Harvey Solar was not required to describe the equipment proposed to control such effluents.

### 3. R.C. 4903.09

{¶ 56} The residents also argue that the board failed to set forth reasons in support of its determination that Harvey Solar provided the water-quality data that was required by former Adm.Code 4906-4-07(C). R.C. 4903.09 requires the board to set forth "findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact." That provision also requires the board to provide this court with an adequate record so that we may determine how the board reached its decision. *In re Application of Ohio Power Co.*, 2024-Ohio-2890, ¶ 32.

{¶ 57} During the board proceedings, the residents specifically argued that issuing a certificate without all the water-quality data required by the administrative rule would violate R.C. 4906.10(A)(2) and (3). In its order, the board noted Harvey Solar's argument that it had complied with the "applicable water quality requirements" in former Adm.Code 4906-4-07(C). The board then found that the information in the record about the "permits that Harvey will obtain to mitigate water quality impacts" are "in compliance with Ohio Adm.Code 4906-4-07(C) and provided information sufficient for the Board to make determinations as to R.C. 4906.10(A)(2), (3), and (5) with respect to water quality issues."

{¶ 58} The board provided us with an adequate record relating to water-quality data. The board found that the record, including Harvey Solar's commitment to obtain the necessary permits, supplied sufficient information about potential water-quality issues and associated mitigation measures for it to make the determinations required by R.C. 4906.10(A)(2) and (3). The board's explanation therefore met the requirements of R.C. 4903.09.

*4.  R.C. 4906.10(A)(5)*

**{¶ 59}** In this proposition of law, the residents also assert—without explanation—that the board violated R.C. 4906.10(A)(5) by issuing a certificate without the water-quality data required by the administrative rules.  That provision says that the board shall not grant a siting certificate unless it finds and determines "[t]hat the facility will comply with Chapter[] . . . 6111. of the Revised Code"—the chapter that sets rules and standards for water pollution control.

**{¶ 60}** The board expressly found that the project will comply with R.C. Ch. 6111 and the rules and standards adopted under that chapter.  On appeal, it is the residents' burden to show that this finding was in error.  But the residents offer only a conclusory statement that R.C. 4906.10(A)(5) was violated.  "Unsupported legal conclusions do not demonstrate error."  *In re Complaint of Toliver v. Vectren Energy Delivery of Ohio, Inc.*, 2015-Ohio-5055, ¶ 30.

**{¶ 61}** Accordingly, we reject the residents' fifth proposition of law.

*F.  Public Interest, Convenience, and Necessity*

**{¶ 62}** In their sixth proposition of law, the residents argue that the board acted unlawfully and unreasonably by issuing a certificate to Harvey Solar without evaluating the resulting negative economic impacts as required by R.C. 4906.10(A)(6) and former Adm.Code 4906-4-06.  Under R.C. 4906.10(A)(6), the board must find that a proposed facility "will serve the public interest, convenience, and necessity."

**{¶ 63}** The residents do not challenge the board's R.C. 4906.10(A)(6) public-interest finding directly.  Instead, they argue that the board lacked necessary information to make this determination because Harvey Solar failed to comply with former Adm.Code 4906-4-06(E)(4).  That provision required that an applicant "provide an estimate of the economic impact of the proposed facility on local commercial and industrial activities."  2015-2016 Ohio Monthly Record at 2-1885.

**{¶ 64}** Harvey Solar submitted an economic report prepared by Kent State University and the University of Akron. The authors used the impact-analysis-for-planning methodology to measure the direct and indirect economic impacts of the project and the induced effects of the increase in income in the local area as a result of an increased demand for local goods and services. The authors estimated that construction of the facility will bring in $161 million in spending to the local area, create 1,092 full-time jobs, and increase local residents' incomes by $59 million; that operation of the facility will increase spending in the local area by $3.7 million and provide four full-time jobs; and that operation of the facility will increase yearly local tax revenues by $3.3 million. The authors also conducted a supply-chain analysis of the 30 local industries that will be most affected by construction of the facility and estimated the potential growth of those industry sectors.

**{¶ 65}** The residents contend, however, that the economic estimate was inadequate because it did not quantify negative economic impacts arising from the property owners' decisions to lease their land to Harvey Solar rather than use it for farming. In particular, they assert that the study should have quantified losses to (1) local businesses that had provided goods and services for use on land that had previously been farmed, (2) the lost value of agricultural crops grown on those farms, and (3) potential losses to farmers who had previously rented the land.

**{¶ 66}** The ultimate question, however, is whether the board acted unreasonably in determining that the facility will serve the public interest, convenience, and necessity under R.C. 4906.10(A)(6). In reaching its determination, the board considered possible negative economic impacts. It expressly stated that it had examined through a "broad lens" whether the facility will serve the public interest, convenience, and necessity, that it had balanced projected benefits against potential negative impacts on the local community, and that it considered the record "as a package." The board noted the residents' arguments about potential economic harm to local businesses and farmers.

However, considering the record as a whole, the board determined that the evidence had shown that Harvey Solar had proved that by creating both construction and operational jobs, along with associated earnings and economic output, its facility will serve the public interest, convenience, and necessity, in compliance with R.C. 4906.10(A).

{¶ 67} Because the record demonstrates that the board considered both positive and negative economic impacts in reaching its determination that the facility "will serve the public interest, convenience, and necessity," we reject the residents' sixth proposition of law.

### G. Glare

{¶ 68} In their seventh and final proposition of law, the residents assert that the board acted unlawfully and unreasonably by issuing a certificate without receiving adequate information about the facility's potential glare, therefore violating its duties to determine the nature of the probable environmental impact and to determine that the facility represents the minimum adverse environmental impact considering the state of available technology and other pertinent considerations under R.C. 4906.10(A)(2) and (A)(3), respectively.

{¶ 69} In advancing these arguments, the residents rely on former Adm.Code 4906-4-08(D)(4)(c), which required an applicant to "[d]escribe the alterations to the landscape caused by the facility, including a description and illustration of the scale, form, and materials of all facility structures, and evaluate the impact of those alterations to the scenic quality of the landscape," 2017-2018 Ohio Monthly Record at 2-3002. The former rule did not mention "glare" or expressly require an applicant to submit a glare analysis.

{¶ 70} Nonetheless, Harvey Solar submitted a glare analysis, which assessed potential glare from the facility's solar panels on local roads and at nearby residences. The consultant who conducted the analysis testified that he had modeled potential glare with the solar panels resting at a five-degree angle, which

22

will produce less glare than a panel resting flat, and had assumed that Harvey Solar would install solar panels with antireflective coating. Based on the modeling, the consultant concluded that no glare would occur at nearby residences and that only a small amount of glare was reported on one segment of a nearby gravel road.

{¶ 71} The residents contend that neither the stipulation nor the certificate expressly requires Harvey Solar to operate the facility in the manner studied—that is, with the solar panels resting at a five-degree angle or with antireflective coating on the solar panels. Without those express conditions in the certificate, the residents assert that Harvey Solar's glare analysis did not accurately predict the amount of glare from the facility.

{¶ 72} But in a filing before the board, Harvey Solar committed to ensuring that "the glare from the Project will be no greater than the glare studied, reported, and investigated by [the board's staff], which utilized a rest angle of 5 degrees" and "commit[ed] to using solar panels with an anti-reflective coating or similar anti-reflective property." The stipulation requires Harvey Solar to install the facility, utilize equipment, and implement mitigation measures "as described in the application and as modified and/or clarified in supplemental filings." Relying on this stipulation, the board concluded that Harvey Solar is obligated to construct the facility as clarified in its supplemental filings. The residents have failed to establish that the board's reliance on Harvey Solar's commitments in its posthearing brief was unlawful or unreasonable.

{¶ 73} The residents have not demonstrated that Harvey Solar failed to supply information about potential glare that was required by an administrative rule. And we find nothing unreasonable in the board's determinations about the facility's expected environmental impact relating to glare.

{¶ 74} We therefore reject the residents' seventh proposition of law.

### III. Conclusion

**{¶ 75}** The residents have not demonstrated that the board acted unlawfully by failing to comply with applicable laws and regulations. And they have failed to establish that the board acted unreasonably in making the determinations required by R.C. 4906.10(A). Therefore, we affirm the board's order granting Harvey Solar a certificate for the construction, operation, and maintenance of Harvey Solar's facility.

Order affirmed.

_____

**KENNEDY, C.J., concurring in judgment only.**

**{¶ 76}** I concur in the court's judgment because the opponents of the Harvey Solar project failed to present sufficient evidence that the project goes against the public's interest. Here, the former version of Adm.Code 4906-4-06(E)(4) required Harvey Solar to submit an "estimate" of its proposed project's "economic impact," 2015-2016 Ohio Monthly Record, 2-1885 (effective Dec. 11, 2015). R.C. 4906.10(A)(6) required the Ohio Power Siting Board to use that estimate to determine if the project would "serve the public interest, convenience, and necessity," but Harvey Solar's estimate included only evidence of its project's positive economic impact. That did not matter much here, because the resident opponents presented evidence of the project's negative economic impact, but the board could face situations in which no party presents evidence of a project's negative economic impact. Accordingly, I concur in judgment only because under former Adm.Code 4906-4-06(E)(4), Harvey Solar should have submitted evidence of its proposed project's negative impact.

**{¶ 77}** Rights relating to property—the right to acquire, use, and dispose of it—are fundamental. *See Buchanan v. Warley*, 245 U.S. 60, 74 (1917); *Reece v. Kyle*, 49 Ohio St. 475, 484 (1892), *overruled in part on other grounds by Mahoning Cty. Bar Assn. v. Ruffalo*, 176 Ohio St. 263 (1964). But landowners dealing with

public utilities should expect regulation. "Public utilities that provide electricity . . . are subject to substantial regulatory controls . . . ." *Toledo Edison Co. v. Bryan*, 2000-Ohio-169, ¶ 17. Indeed, it is well-established that "where the owner of property devotes it to a use in which the public have an interest, he, in effect, grants to the public an interest in such use, and must, to the extent of that interest, submit to be controlled by the public, for the common good, as long as he maintains the use." *Zanesville v. Zanesville Gas-Light Co.*, 47 Ohio St. 1, 30 (1889), citing *Munn v. Illinois*, 94 U.S. 113, 126 (1876). So, when deciding whether to approve a certificate for a public utility, there must be a balance between property rights and regulation.

{¶ 78} Under R.C. 4906.10(A)(6), the board must find that the proposed solar facility "will serve the public interest, convenience, and necessity." Pursuant to that statute, the board promulgated former Adm.Code 4906-4-06(E)(4), which required Harvey Solar to "provide an estimate of the economic impact of the proposed facility on local commercial and industrial activities," 2015-2016 Ohio Monthly Record at 2-1885. That language required the applicant to submit evidence of both the proposed project's positive and negative economic impacts.

{¶ 79} The interpretation that former Adm.Code 4906-4-06(E)(4) required applicants for a certificate of public utility to submit in their application evidence of positive and negative economic impacts tracks the text of both the regulation and statute. As always, "[t]erms that are undefined in a statute are accorded their common, everyday meaning." *Stewart v. Vivian*, 2017-Ohio-7526, ¶ 25. The same applies to administrative rules. *See McFee v. Nursing Care Mgt. of Am., Inc.*, 2010-Ohio-2744, ¶ 27. Here, the issue is whether an "estimate" of "economic impacts" includes both positive and negative impacts. Ordinarily, an estimate is "the act of appraising or valuing." *Webster's Third New International Dictionary* (2002). To appraise or value something requires weighing costs and benefits, including positive and negative impacts. In determining the "public interest, convenience,

and necessity," it would be arduous for the board to properly "appraise or value" the proposed project's effect on those factors with evidence of only its positive impacts.

**{¶ 80}** In this case, Harvey Solar's failure to submit evidence of the project's negative economic impacts did not result in prejudice, because the board still had that evidence before it. *See In re Application of Champaign Wind, L.L.C.*, 2016-Ohio-1513, ¶ 15 ("Even if the board errs in a procedural or evidentiary ruling, this court will not reverse the board's order unless the error prejudiced . . . the appellant."). But under today's interpretation of former Adm.Code 4906-4-06(E)(4), the board could face a scenario in which no one challenges a proposed facility, leaving the board with no negative-economic-impacts evidence to consider. A decision in which the agency does not consider economic evidence could result in prejudice. *See In re Application of Firelands Wind, L.L.C.*, 2023-Ohio-2555, ¶ 55, quoting R.C. 4906.10(A)(6) ("After balancing the facility's projected benefits with the potential negative impacts, the board found that the project 'will serve the public interest, convenience, and necessity. . . .' ").

**{¶ 81}** Because the board cannot properly evaluate what is in the public's interest without evidence of positive and negative economic impacts, I concur in judgment only.

————————————

Van Kley Law, L.L.C., and Jack A. Van Kley, for appellants.

Dave Yost, Attorney General, and John H. Jones, Thomas Lindgren, and Amy Botschner O'Brien, Assistant Attorneys General, for appellee.

Dickinson Wright, P.L.L.C., Christine M.T. Pirik, Matthew C. McDonnell, Jonathan R. Secrest, and David A. Lockshaw Jr., for intervening appellee.

————————————